985 So.2d 524 (2008)
Thomas D. WOODEL, Appellant,
v.
STATE of Florida, Appellee.
No. SC05-1336.
Supreme Court of Florida.
May 1, 2008.
Rehearing Denied June 26, 2008.
*525 James Marion Moorman, Public Defender, and Robert F. Moeller, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, FL, and Carol M. Dittmar, Senior Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
Thomas Woodel appeals the death sentence imposed upon him after we remanded for a new written sentencing order that complied with the procedural requirements outlined in Jackson v. State, 767 So.2d 1156, 1160-61 (Fla.2000). See Woodel v. State, 804 So.2d 316, 327 (Fla.2001) (vacating the sentences of death and remanding for a new written sentencing order). We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we affirm the sentence of death imposed for the murder of Bernice Moody and the sentence of life in prison imposed for the murder of Clifford Moody.

I. FACTS AND PROCEDURAL HISTORY
Thomas Woodel was convicted of armed robbery, armed burglary, and two counts of first-degree murder based on the murders of Clifford and Bernice Moody. The facts surrounding the murder were set forth as follows:
Clifford Moody, who was seventy-nine years old, and his seventy-four year old wife, Bernice, lived in a mobile home trailer on lot 533 at Outdoor Resorts of America in Polk County. The Moodys owned another trailer on adjoining lot 532, which they sometimes rented. Bernice was seen by the newspaper delivery man cleaning lot 532 about 4:30 to 4:45 a.m. on December 31, 1996. Clifford was last seen by a security person at the Outdoor Resorts Laundromat at about 5:30 a.m. The Moodys were preparing to show the mobile home for rental that day.
The Moodys were found dead a little after 1 p.m. on December 31, 1996. Clifford was found lying on his back in the dining room area of the trailer on lot 532. His underwear and pants had been pulled down to below his knees. His eyeglasses lay approximately two feet from his head. Dr. Alexander Melamud, the medical examiner, testified that Clifford received a total of eight stab wounds, causing more internal than external bleeding, and that he died as a result of these stab wounds close in time to his wife's death.
Bernice was found in the same trailer with multiple stab wounds. She lay dead on a bed in the back of the trailer and was nude except for one sock. A nightgown and female underwear with a knot tied in it lay on the floor next to the bed. Additionally, pieces of a porcelain toilet tank lid were found underneath *526 her. Dr. Melamud testified that Bernice incurred a total of fifty-six cut or stab wounds, many of which on her right arm he opined to be defensive. Her jugular vein had been slit. Additionally, she had received significant blunt trauma injuries to her head, and her nasal bones were fractured. Dr. Melamud testified that Bernice died as a result of her injuries sometime in the early morning hours of December 31, 1996. No semen was detected on Bernice.
With the permission and assistance of Outdoor Resorts, detectives searched the park's dumpsters the morning of January 3, 1997. The dumpsters had not been emptied since prior to December 31, 1996. During the search, detectives found three garbage bags containing pieces of a porcelain toilet tank lid, a wallet containing Clifford's identification and credit cards, keys with a tag stating "Cliff's keys," glasses, bloody socks, paperwork with the address of lot 301, and paperwork bearing the names of the defendant and his son, Christopher Woodel.
That afternoon, detectives went to lot 301. Woodel lived there with his long-time girlfriend, Christina Stogner, and his sister, Bobbi Woodel. Woodel and his sister signed consent forms to have their trailer searched. Stogner was out of town at that time. Also present that day at lot 301 was Gayle Woodel. Although not known at that time, it would later be discovered that Gayle married Woodel in 1989, and they had a son together, Christopher. Gayle and Woodel separated in 1992 but never divorced. In 1996, Gayle and Christopher lived in North Carolina while Woodel lived in Florida. However, Gayle had just come to Florida from North Carolina so that Christopher could spend some time with Woodel. Gayle, Christopher, and two of Gayle's friends were staying at Woodel's trailer.
While some detectives searched the premises, Woodel agreed to be questioned by other detectives. As Woodel left with the detectives, Woodel went over to Gayle and whispered for her to get rid of the knife Woodel had hidden. Gayle told Woodel's landlady and friend about the content of the communication. Gayle later told deputies as well.
The detectives gave Woodel Miranda warnings, and he consented to talk with them. He initially told the detectives that he had been home asleep at the time of the murders. After further questioning, Woodel began to write out a statement. He then stopped and confessed to killing the Moodys, whom he said he had never met. The detectives then tape-recorded Woodel's confession. In this taped confession played for the jury, Woodel admitted to drinking with others that evening after work in the lot next to the Pizza Hut where he worked. Afterwards, Woodel walked to Outdoor Resorts, a little over a mile from the Pizza Hut. Woodel admitted to entering the Moody's rental trailer early in the morning after seeing Bernice through the window. He said he went in to ask for the time. According to Woodel, Bernice was alone in the trailer. Upon seeing him, she came at him with a knife, over which Woodel soon gained control. He then proceeded to stab her many times and hit her over the head with a porcelain toilet tank lid one to three times. The toilet lid shattered.
Clifford was last seen doing laundry at the Laundromat by security guard Elmer Schultz between 5:30 and 5:40 a.m. In his confession, Woodel said that he was leaving the trailer when Clifford came inside. Woodel then stabbed Clifford. As Clifford lay on the floor, Woodel picked up a bucket and placed pieces *527 of the shattered toilet tank lid in it. He also placed the knife along with several other items in the bucket. Woodel said that after stabbing Clifford, he took Clifford's wallet.
Woodel also said in his confession that he threw some items into a canal in the mobile home park, threw some items away in his garbage, and hid the knife behind a dresser. Deputies would later find pieces of the toilet tank lid and Bernice's eyeglasses in the canal, and a knife in Woodel's room wedged between a wall and the dresser.
Woodel, 804 So.2d at 319-20. The jury recommended death by a vote of nine to three for Clifford's murder and by a vote of twelve to zero for Bernice's murder. The trial court followed the jury's recommendation and sentenced Woodel to death for both murders. On December 20, 2001, this Court affirmed all of the convictions but vacated both death sentences because we were unable to provide a meaningful review of the death sentence in light of the sentencing order, which failed to expressly evaluate each mitigating circumstance, determine whether these mitigators were truly mitigating, and properly weigh the aggravators against the mitigators, as set forth in Jackson, 767 So.2d at 1160-61. See Woodel, 804 So.2d at 327.
The original trial judge was no longer available, so the case was assigned to a new judge, and a new penalty phase was held, where the State presented numerous victim impact statements and evidence to show the jury a comprehensive picture of the crime. Counsel for Woodel presented detailed information about Woodel's childhood, character, and mental health, emphasizing the abuse and neglect Woodel suffered as a child and how the crime was extremely out of character for Woodel. The jury recommended a life sentence for the murder of Mr. Moody and recommended death by a vote of seven to five for the murder of Ms. Moody. After a Spencer[1] hearing was held, the trial court followed the jury's recommendation as to both murders. The court found four aggravating circumstances (prior violent felony conviction; committed during commission of a burglary; especially heinous, atrocious or cruel (HAC); and victim vulnerability due to age or disability); four statutory mitigators (no significant criminal history; defendant's age; substantial impairment of capacity to appreciate his actions or conform his conduct to the requirements of law; and extreme emotional disturbance); and ten nonstatutory mitigators (physical abuse as a child; neglect and rejection by his mother and others; an unstable home as child; parents who were deaf and spoke primarily in sign language; abuse of alcohol and drugs; willingness to meet with the victims' daughter; willingness to be tested for bone marrow donation for his daughter; the defendant's belief in God; his voluntary confession; and the defendant's compassion for others). The court concluded that the aggravating factors far outweighed the mitigation and imposed a sentence of death for the murder of Ms. Moody.
On appeal, Woodel raises six claims: (1) the trial court erred in excusing for cause two jurors who were not sufficiently fluent in the English language without the aid of an interpreter; (2) fundamental error occurred when the jury heard and considered prejudicial testimony from a State witness; (3) the trial court erred in finding the aggravating factor of "vulnerability due to advanced age or disability" with regard to the murder of Bernice Moody; (4) Woodel's sentence of death is not proportional; (5) Woodel is entitled to a life *528 sentence because Florida's death penalty law violates his due process right and his right to a jury; and (6) execution by lethal injection constitutes cruel and unusual punishment.

II. ANALYSIS
First, Woodel asserts that during his new penalty phase, the trial court erred in dismissing for cause two jurors because they were not proficient in English, thereby depriving him of a jury that comprised a fair cross-section of the community. The State contends that this claim is procedurally barred. The record shows that when the first juror informed the court that he was having trouble understanding the proceedings without an interpreter, the trial judge excused the juror after an interpreter could not be found. The judge further advised counsel that while she could appoint an interpreter for voir dire and the proceedings, caselaw prohibited the interpreter from assisting the juror during jury deliberations. Defense counsel expressed some concern about this ruling. Later in the proceedings, the trial court excused a second juror after the juror informed the court that he did not feel that he spoke English well enough to serve as a juror. Defense counsel raised a fair cross-section argument to the trial judge, recognizing that there was caselaw which prevented the court from permitting an interpreter to enter the jury room for deliberations but arguing that this case violated the Constitution. Defense counsel later renewed this objection when the parties were accepting the jury panel. Based on the record, we find the objection was sufficiently preserved.
In turning to the merits of the claim, the United States Supreme Court's decision in Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), held that in order to establish a violation of the fair cross-section requirement, the following three elements are required:
(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.
Id. at 364, 99 S.Ct. 664; see also Gordon v. State, 863 So.2d 1215, 1218 (Fla.2003) (applying the Duren test in evaluating a fair cross-section claim). Even if these three prongs are met, this does not mean a constitutional violation has occurred. As the United States Supreme Court held, "States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community." Duren, 439 U.S. at 367, 99 S.Ct. 664 (quoting Taylor v. Louisiana, 419 U.S. 522, 538, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975)). Such exemptions, however, must be supported by a significant state interest, as opposed to merely rational grounds. Id. "[O]nce the defendant has made a prima facie showing of an infringement of his constitutional right to a jury drawn from a fair cross section of the community, it is the State that bears the burden of justifying this infringement by showing attainment of a fair cross section to be incompatible with a significant state interest." Id. at 368, 99 S.Ct. 664.
Turning to the case before us, while Woodel argues that the exclusion of two jurors violated the fair cross-section requirement, he fails to demonstrate any of the necessary elements as required under the Duren test. First, he has failed to present any argument that the group "Hispanics *529 who are not proficient in English" is a "distinctive" group in the community. Likewise, Woodel fails to offer any statistical evidence showing "the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community." Duren, 439 U.S. at 364, 99 S.Ct. 664. Woodel has offered no statistical evidence of the number of non-English-speaking Hispanics in his community. In Gordon, this Court summarily denied a fair cross-section claim after noting that the defendant failed to establish a prima facie showing under the Duren test.
Because Gordon has not initially established a prima facie showing in his motion that black people were systematically excluded from the jury selection process, his claim was properly summarily denied by the trial court. In other words, Gordon has not set out in his motion a proper claim on the merits on this issue that counsel could have advanced.
Gordon, 863 So.2d at 1218; see also Robinson v. State, 707 So.2d 688, 699 (Fla.1998) (holding that trial court did not err in summarily denying claim where appellant "made no showing at trial or in his postconviction motion that blacks are systematically excluded from venires in St. Johns County").
Even if Woodel had presented evidence as to these elements, we would not find that a constitutional violation occurred in excluding these jurors. The United States Supreme Court has expressly held that states may prescribe "relevant qualifications for their jurors" so long as this is supported by a significant state interest. See Duren, 439 U.S. at 367-68, 99 S.Ct. 664. Woodel points out that there is no statutory requirement under Florida law mandating that a juror must be proficient in English in order to serve on a jury. Compare § 40.01, Fla. Stat. (2005) (setting forth the qualifications of a juror, none of which address a proficiency in English), with 28 U.S.C. § 1865(b)(2)-(3) (2000) (providing that the ability to speak and understand the English language are a requirement for federal jury service). While Woodel is correct that a Florida statute does not expressly address this issue, section 40.013(6), Florida Statutes (2005), states that a person is to be excused from jury service "upon a showing of hardship, extreme inconvenience, or public necessity." (Emphasis added.) Here, the trial judge recognized that she was able to appoint an interpreter to assist in the voir dire and the trial proceedings, but that permitting the interpreter to assist during jury deliberations would contravene the crucial state interest in protecting the sanctity of the jury deliberations, which is a necessity. In Dilorenzo v. State, 711 So.2d 1362 (Fla. 4th DCA 1998), the Fourth District Court of Appeal held that permitting the use of an interpreter during jury deliberations constituted fundamental error because "[u]nder the common law of this jurisdiction the sanctity of the jury room has been so zealously protected that the introduction or intrusion therein of an unauthorized person during jury deliberations has been regarded as fundamental error requiring either a mistrial or a new trial." Id. at 1363. We find no error in the trial court's ruling to follow Dilorenzo.
Moreover, a trial court has inherent power to assure due process in the trial of a case by protecting the integrity of jury deliberations. Numerous problems would occur if trial courts permitted the use of an interpreter in jury deliberations, even if only one juror required such special accommodations. Jury deliberations are to be exchanges of analysis and beliefs based upon lawfully admitted evidence by discussions among only the sworn jurors and are protected against influences extraneous to *530 the deliberations by those sworn jurors. The trial court's ruling on this issue adhered to this fundamental principal.
In his second claim for relief, Woodel asserts that fundamental error occurred when jailhouse informant Arthur White testified that Woodel admitted that he had dragged Bernice Moody into the bedroom and fondled her. This Court has defined fundamental error as follows:
Fundamental error is error that reaches "down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Kilgore v. State, 688 So.2d 895, 898 (Fla. 1996) (quoting State v. Delva, 575 So.2d 643, 644-45 (Fla.1991)). Error during the penalty phase is fundamental if it is "so prejudicial as to taint the jury's recommended sentence." Fennie v. State, 855 So.2d 597, 609 (Fla.2003) (quoting Thomas v. State, 748 So.2d 970, 985 n. 10 (Fla.1999)).
Jones v. State, 949 So.2d 1021, 1037 (Fla. 2006).
We do not agree that Woodel met this standard of showing that a fundamental error occurred. Specifically, when White was questioned as to Woodel's admission concerning the removal of Bernice Moody's clothes, White replied:
[White]: Well, at the point in time when he knocked her down, he ripped her nightgown from here (indicating), you know. And I really don't remember what else, but he drug her into the bedroom.
[Prosecutor]: I'm sorry, he did what?
[White]: He drug her in the bedroom and he fondled her, but he didn't tell me exactly where or how because somebody walked in and like the conversation just stopped, you know, because I was telling him don't tell nobody else about the case and things like this here because they would use it against him and things of that nature.
Woodel provides no direct authority as to why White's statements would be improper other than alleging that this was irrelevant and highly inflammatory, constituting a nonstatutory aggravating circumstance. Section 921.141(1), Florida Statutes (2005), which governs the penalty-phase proceedings, provides in pertinent part that evidence "relevant to the nature of the crime and the character of the defendant" is admissible "regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements." In this case, White's statements regarding Woodel's confession that he pushed Bernice into the bedroom and fondled her were relevant to the nature of the crime. Woodel failed to show a meritorious basis for excluding this testimony and clearly did not demonstrate why the admission of this evidence constituted fundamental error.
In his next claim for relief, Woodel alleges that the trial court erred in finding the aggravating factor that the victim was particularly vulnerable due to advanced age or disability. First, he asserts that this Court should review this claim de novo. In Willacy v. State, 696 So.2d 693, 695-96 (Fla.1997), this Court explicitly rejected such an argument, holding that
it is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubtthat is the trial court's job. Rather, our task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.
*531 Id. (footnote omitted). In turning to the trial court's findings as to this aggravator, the trial court found that this aggravator was established and supported based on the following:
Bernice Moody was 74 years of age when she died. She wore glasses, had limited range of motion of her left arm due to a shoulder injury in the spring of the year resulting in loss of arm strength.
Dr. Steve Nelson, the Medical Examiner, testified that the toxicology screen indicated that the drugs she had ingested were not prescriptions drugs and may have been for arthritis, general pain and allergies.
Based on the evidence, the court finds that this aggravator was proved beyond a reasonable doubt and gives it moderate weight.
State v. Woodel, Sentencing Order at 4, No. CF97-00047A-YY (10th Cir. order filed July 1, 2005) (Order). Woodel does not challenge any of these specific findings but asserts that in reviewing them as a whole, this is insufficient to support the aggravator, particularly since Ms. Moody's arm was back to normal other than a loss of arm strength. In support of his argument, Woodel relies on the testimony of some of the Moodys' good friends who were not aware that Bernice Moody had any physical disabilities and testified that she was very active.
Woodel made a similar claim in the prior proceeding, and this Court then explicitly rejected his claim, holding that competent, substantial evidence supported that aggravator. Woodel, 804 So.2d at 324-26. Even though a new penalty phase was held, similar evidence was presented and relied upon by the trial court in finding this aggravator a second time. In reviewing the record before us, we find competent, substantial evidence exists to support the trial court's finding as to this aggravator. Ms. Moody's daughter testified as to her mother's age, that she wore glasses, and that her mother had broken her arm earlier that spring in a serious accident. As the daughter recalled, Ms. Moody "broke the ball and socket apart, just broke it, snapped it right off." Ms. Moody was initially told that she could lose all use of that arm, but she exercised it daily in order to get it back to normal. At the time of her death, the daughter testified that her mother had not yet regained all of the strength in that arm. The medical examiner testified that he found some medicine in Bernice's system which could indicate that she was in pain. The limitations which were proven by the record, in addition to Ms. Moody's age, are sufficient to support this aggravating circumstance.
In his fourth claim, Woodel contends that the sentence of death is not proportional. In reviewing the resentencing order, the trial judge found four aggravators;[2] four statutory mitigators;[3] and *532 ten nonstatutory mitigators.[4] In balancing these factors, the court stated as follows:
In weighing the aggravating circumstances against the mitigating factors, the court understands that the weighing process is not simply an arithmetic exercise. The court's role is to consider the quality of the factors to be weighed, not the quantity of those factors. Accordingly, the court considers the nature and quality of the aggravators and mitigators that it has found to exist.
The court allowed the introduction of Victim Impact testimony pursuant to Fla. Stat. 921.141. The Court is sympathetic to the impact this murder has had on family and friends and gives no weight to that testimony in weighing the aggravating and mitigating circumstances in determining a proper sentence.
The court finds that the aggravating circumstances in this case far outweigh the mitigating circumstances. Each of the four aggravating circumstances is appalling and even if the aggravating circumstances of the heinous, atrocious and cruel manner in which this senseless crime was committed were not to be considered, this court would feel that the remaining three aggravators outweigh the existing mitigators.
Order at 10. This Court has described the proportionality review as follows:
The function of this Court's proportionality review is to foster uniformity in death penalty law. See Beasley v. State, 774 So.2d 649, 673 (Fla.2000) (citing Tillman v. State, 591 So.2d 167, 169 (Fla. 1991)). The analysis by which to achieve this function is to "consider the totality of circumstances in a case, and to compare it with other capital cases." Id. (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)). As we have explained:
[T]he death penalty is reserved "for the most aggravated and unmitigated of most serious crimes." Clark v. State, 609 So.2d 513, 516 (Fla.1992) (quoting State v. Dixon, 283 So.2d 1, 7 (Fla.1973)). This Court performs proportionality review to prevent the imposition of "unusual" punishments contrary to article I, section 17 of the Florida Constitution. See Tillman v. State, 591 So.2d 167, 169 (Fla.1991). In deciding whether death is a proportionate penalty, the Court must consider the totality of the circumstances of the case and compare the case with other capital cases. See Urbin v. State, 714 So.2d 411, 416-17 (Fla. 1998). "It is not a comparison between the number of aggravating and mitigating circumstances." Porter v. State, 564 So.2d 1060, 1064 (Fla.1990).
Sexton v. State, 775 So.2d 923, 935 (Fla. 2000). Further, this Court has stated:
Proportionality review "requires a discrete analysis of the facts," Terry v. State, 668 So.2d 954, 965 (Fla.1996), entailing a qualitative review by this Court of the underlying basis for each *533 aggravator and mitigator rather than a quantitative analysis.
Urbin, 714 So.2d at 416.
Morris v. State, 811 So.2d 661, 668 (Fla. 2002). Based on the circumstances of the crime, we find the sentence of death is proportional to other similar crimes.
In Smithers v. State, 826 So.2d 916, 931 (Fla.2002), after the defendant was found with a bloody ax in his hands, the defendant confessed to murdering two women. The trial court found three aggravators for the one victim (previous violent felony based on the contemporaneous murder, HAC, and cold, calculated, and premeditated) and two aggravators for the murder of the other victim (previous violent felony for the contemporaneous murder and HAC). The trial court in Smithers found two of the same statutory mitigators that were found in Woodel: (1) the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance; and (2) the defendant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired. Smithers, 826 So.2d at 931. The trial court in Smithers also found seven nonstatutory mitigators, including physical and emotional abuse by his mother as a child, and the defendant confessed to the crime. After balancing these factors and the jury's unanimous recommendation for a death sentence, the trial court found that the aggravators outweighed the mitigation and imposed the death sentence. This Court upheld the death sentence, finding that it was proportionate to similar cases that involved similar aggravating and mitigating circumstances. Id. This Court has found the death sentence proportional in other situations involving stabbing murders which occurred during a burglary. See, e.g., Jimenez v. State, 703 So.2d 437, 442 (Fla.1997) (upholding Jimenez's death sentence for stabbing death of elderly female inside her home where court found four aggravatorsprior violent felony, committed during commission of a burglary, committed while on community control, and HACoutweighed one statutory mitigator and two nonstatutory mitigators), receded from on other grounds by Delgado v. State, 776 So.2d 233 (Fla. 2000); Johnson v. State, 660 So.2d 637, 648 (Fla. 1995) (upholding death sentence for stabbing death of elderly female inside her home during a burglary where court found three aggravatorsprior violent felony, committed for financial gain, and HAC outweighed fifteen nonstatutory mitigators). Based on the foregoing, we find the sentence of death is proportionate to other cases in which the death sentence was imposed.
In his penultimate claim, Woodel alleges that Florida's death penalty law violates his due process right and his right to a jury based on Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court has repeatedly rejected this argument, and Woodel presents no new reasons for revisiting this issue. See, e.g., Coday v. State, 946 So.2d 988, 1005-06 (Fla.2006) (explicitly rejecting the claims that the United States Supreme Court's decisions in Apprendi and Ring require a finding that the Florida capital sentencing scheme is unconstitutional, rejecting the claim that a jury must unanimously recommend death, and rejecting the claim that the State must allege the aggravating circumstances in the indictment), cert. denied, ___ U.S. ___, 127 S.Ct. 2918, 168 L.Ed.2d 249 (2007).
In his final claim, Woodel challenges whether Florida's current protocol, including the three-drug cocktail, violates the Eighth Amendment. This Court has recently *534 rejected these claims. See Lightbourne v. McCollum, 969 So.2d 326, 353 (Fla.2007); Schwab v. State, 969 So.2d 318, 325 (Fla.2007). We likewise deny Woodel's claim on this same issue.

III. CONCLUSION
For the reasons stated above, we find all of Woodel's claims to be without merit. Accordingly, we affirm Woodel's sentences, including the sentence of death for the murder of Bernice Moody.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla. 1993).
[2] The court found the following aggravators: (1) the defendant was previously convicted of another capital felony based on the contemporaneous murder of Clifford Moody (great weight); (2) the capital felony was committed while the defendant was engaged in the commission of or an attempt to commit or flight after committing or attempting to commit a burglary (great weight); (3) the capital felony was especially heinous, atrocious, or cruel (great weight); and (4) the victim was particularly vulnerable due to advanced age or disability (moderate weight).
[3] The court found the following statutory mitigators: (1) the defendant had no significant history of prior criminal activity (moderate weight); (2) age of the defendant (little weight); (3) the defendant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired (little weight); and (4) the felony was committed while the defendant was under the influence of extreme mental or emotional disturbance (little weight).
[4] The court found the following nonstatutory mitigators: (1) the defendant suffered physical abuse as a child (moderate weight); (2) the defendant was neglected and rejected by his mother (moderate weight); (3) the defendant had an unstable home as a child (moderate weight); (4) his parents were deaf and spoke primarily in sign language (moderate weight); (5) the defendant abused alcohol and drugs (little weight); (6) the defendant was willing to meet with the victims' daughter (little weight); (7) the defendant was willing to donate bone marrow to his daughter, who had leukemia (little weight); (8) the defendant believes in God (little weight); (9) he confessed to the murders (little weight); and (10) he had compassion for others (little weight).