995 So.2d 922 (2008)
Mark Dean SCHWAB, Appellant,
v.
STATE of Florida, Appellee.
No. SC08-1199.
Supreme Court of Florida.
June 27, 2008.
*923 John W. Jennings, Capital Collateral Regional Counsel, Peter J. Cannon, Mark S. Gruber, and Daphney Gaylord, Assistant CCR CounselMiddle Region, Tampa, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, FL, and Kenneth S. Nunnelley, Senior Assistant Attorney General, Daytona Beach, FL, for Appellee.
PER CURIAM.
Mark Dean Schwab, a prisoner under sentence of death, appeals the circuit court's order denying his third successive motion for postconviction relief, which was filed pursuant to Florida Rule of Criminal Procedure 3.851. Because the order concerns postconviction relief from a sentence of death, this Court has jurisdiction of the appeal under article V, section 3(b)(1), Florida Constitution. For the reasons stated below, we affirm the circuit court's order denying relief.
Schwab was convicted of first-degree premeditated murder, sexual battery of a child, and kidnapping, after murdering eleven-year-old Junny Rios-Martinez in April 1991, and he was sentenced to death. This Court set forth the procedural history of this case in Schwab v. State, 982 So.2d 1158 (Fla.2008), and Schwab v. State, 969 So.2d 318 (Fla.2007), cert. denied, ___ U.S. ___, 128 S.Ct. 2486, ___ L.Ed.2d ___ (2008). Schwab's execution was initially scheduled for November 15, 2007, but the United States Supreme Court issued a stay while it considered a challenge to Kentucky's lethal injection protocol in Baze v. Rees. The United States Supreme Court denied the Eighth Amendment challenge to Kentucky's lethal injection protocols, see Baze v. Rees, ___ U.S. ___, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), and thereafter denied Schwab's petition for a writ of certiorari and dissolved the stay. See Schwab v. Florida, ___ U.S. ___, 128 S.Ct. 2486, 171 L.Ed.2d 777 (2008) (denying petition for writ of certiorari, which automatically terminated the stay pursuant *924 to prior order in Schwab v. Florida, ___ U.S. ___, 128 S.Ct. 644, 169 L.Ed.2d 416 (2007)).
Governor Charlie Crist rescheduled Schwab's execution, setting it for July 1, 2008. Schwab then filed a third successive motion for postconviction relief, again challenging whether Florida's lethal injection protocol violates the Eighth Amendment. The circuit court denied the motion in a comprehensive order, and we affirm the circuit court's denial of relief, which we attach and adopt. We agree with the circuit court that Schwab failed to allege newly discovered evidence that would result in a decision different than that reached in Lightbourne v. McCollum, 969 So.2d 326 (Fla.2007), cert. denied, ___ U.S. ___, 128 S.Ct. 2485, ___ L.Ed.2d ___ (2008), and Schwab, 969 So.2d at 326. The circuit court's decision is consistent with our recent decisions in Lebron v. State, 982 So.2d 649 (Fla.2008); Woodel v. State, ___ So.2d ___, 33 Fla. L. Weekly S290, 2008 WL 1901425 (Fla. May 01, 2008); and Griffin v. State, No. SC06-1055, 2008 WL 2415856 (Fla. June 2, 2008).
No motion for rehearing will be entertained by the Court. The mandate shall issue immediately.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.

ATTACHMENT
IN THE CIRCUIT COURT OF THE
 EIGHTEENTH JUDICIAL CIRCUIT,
 IN AND FOR BREVARD
 COUNTY, FLORIDA
 Case No. 05-1991-7249-AXXX.
STATE OF FLORIDA, Plaintiff,
v.
MARK DEAN SCHWAB, Defendant.
ORDER DENYING DEFENDANT'S THIRD SUCCESSIVE MOTION TO VACATE SENTENCE OR STAY EXECUTION
This matter comes before the Court upon the Defendant's Third Successive Motion to Vacate Sentence or Stay Execution, filed on June 21, 2008. The Court denied a successive motion to vacate on August 20, 2007 and denied a second successive motion on November 13, 2007. Both denials were affirmed on appeal. Schwab v. State, 973 So.2d 427 (Fla.2007), Schwab v. State, 982 So.2d 1158 (Fla.2008).
The Court heard oral arguments on the Motion on June 24, 2008 Peter Cannon, Esq., of the Middle District, Regional Capital Collateral Counsel, provided argument on behalf of the Motion Ken Nunnelly [Nunnelley], Esq., of the Florida Attorney General's Office argued on behalf of the State. The Court has carefully considered the Motion, the State's Answer, the exhibits provided by the Defendant and oral arguments.
The Court recognizes that the execution of a condemned criminal is among the most serious and solemn acts a state can undertake and careful deliberation is necessary to assure that constitutional safeguards are met. However, this process does not require the Court to continually review claims which have already been found wanting. At this late stage in the legal process, Schwab is barred from relitigating prior claims and from raising any new claims which he could have raised at an earlier date. His Third Successive Motion reads very much like his prior challenges to Florida's lethal injection protocol, the only possible two new facts being the United States Supreme Court decision, Baze v. Rees, ___ U.S. ___, 128 S.Ct. *925 1520, 170 L.Ed.2d 420 (2008), and any information Schwab gleaned from records of mock executions conducted under the new Florida protocol since August, 2007. Because of these facts, the Court will rule upon the claims asserted.

Constitutional Standards, Risk and the Eighth Amendment
This Court first emphasizes that the Florida Supreme Court, in Lightbourne v. McCollum 969 So.2d 326 (Fla.2007), carefully reviewed the current DOC protocol for lethal injection and the extensive record created by the Circuit Court of Marion County during its evidentiary hearing on lethal injection. It concluded, "[The petitioner] has failed to show that Florida's current lethal injection procedures, as actually administered though the DOC, are constitutionally defective." Id. at 353 (emphasis added).
Since the Lightbourne decision, the United States Supreme Court issued Baze v. Rees, ___ U.S. ___, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), which analyzed the lethal injection standards of the State of Kentucky Justice Roberts, writing the plurality opinion of the Court, began with the principal that capital punishment is constitutional. He noted that the Court has never invalidated a State's chosen procedure for carrying out a sentence of death as violative of the Eighth Amendment and then stated.
It necessarily follows that there must be a means of carrying [a death sentence] out Some risk of pain is inherent in any method of executionno matter how humaneif only from the prospect of error in following the required procedure. It is clear, then, that the Constitution does not demand the avoidance of all risk of pain in carrying out executions.
The Court stated that a method of execution does not constitute cruel and unusual punishment unless it creates "a substantial risk of serious harm," or "an objectively intolerable risk of harm." It also found that the "conditions presenting the risk must be `sure or very likely to cause needless pain' and give rise to `sufficiently imminent dangers.'" It concluded that "[a] State with lethal injection protocol substantially similar to [Kentucky's] would not create a risk that meets this standard." Id. at 1531, 1537.
The Defendant's arguments are essentially two-fold. He contends that Baze sets a different and higher Eighth Amendment standard than Lightbourne and that the Florida protocol do not meet the Baze standard because Florida's procedures are not substantially similar to those of Kentucky, thus exposing him to a substantial risk of harm. He also argues that the Florida protocol, as applied during training, demonstrate that a substantial risk of harm remains in the Florida process.

The Lightbourne Standard
In Lightbourne, the Florida Supreme Court looked at the history of Eighth Amendment standards and found that cruel and unusual punishment is that which involves "torture or a lingering death" or the infliction of "unnecessary and wanton pain." Id. at 341. This would indeed seem to be a different and lesser standard than Baze, lesser in terms of its protection of a defendant. However, the Court also looked at the question of risk and explicitly stated that Lightbourne "has not shown a substantial, foreseeable or unnecessary risk of pain" in the DOC procedures." It states that "even if the Court did review this claim under a `foreseeable risk" standard or an `unnecessary risk' we would likewise find that [the petitioner] has failed to carry his burden of showing an Eighth Amendment violation. "Id. at 534-535[1534-1535]. Thus, the Florida Supreme Court did analyze the risk in terms *926 of whether it was "substantial," a standard very much in line with Baze. It also analyzed the risk in terms of whether it was "foreseeable" or "unnecessary," both of which provide a higher level of protection to defendants Baze specifically rejected the "unnecessary risk" standard proposed by petitioners because it found that this standard would improperly involve the courts in determining "best practices" for execution standards. Id. at 1532. As to what constitutes a "substantial" risk, the Court notes that the word implies more than speculative or possible risks, but those which might be deemed significantly great, considerable, real, material and of substance.
Since the Baze decision of April 2008, the Florida Supreme Court has summarily rejected challenges to the Florida lethal injection protocol three times, citing to Lightbourne Lebron v. State, 982 So.2d 649 (Fla.2008), Woodel v. State, 985 So.2d 524 (Fla.2008), Griffin v. State, 2008 WL 2415856 (Fla. June 2, 2008) Griffin cites to Baze. Although this Court does not know the specifics of the lethal injection claims raised in these three cases, it is clear that the Florida Supreme Court, post-Baze, has considered the constitutionality of the Florida lethal injection protocol and found it constitutional under the Eighth Amendment.

Error Rates in Executions and Training Exercises
The Defendant asserts that "error" rates in recent DOC mock executions demonstrate that the new DOC protocol fails to remedy the problems of the previous procedures and therefore create a substantial risk of serious harm violative of Baze. He provides the analysis of Janine Arvizu, whom he identifies as a "certified quality auditor." Ms. Arvizu is the same auditor whose analysis was rejected by this Court and the Florida Supreme Court in Schwab's prior motion because the Defendant failed to demonstrate how this person was qualified to offer an opinion on this subject ("Schwab fails to sufficiently explain how this auditor is qualified to provide a reliability and efficacy report on DOC's method of execution." Schwab v. State, 969 So.2d 318 (Fla.2007)).
Even assuming the Court accepts the analysis of "error" rates provided by Schwab as true, it finds that they do not rise to constitutional errors. If errors were made in prior Florida executions, no court has held that any of them created an Eighth Amendment violation. Despite the claim of numerous errors both in actual and mock executions, Schwab cites to no Florida lethal injection execution in which DOC's protocol or the implementation thereof were found to have errors arising to constitutional levels.
As noted by Justice Roberts in Baze, "an isolated mishap alone does not give rise to an Eighth Amendment violation, precisely because such an event, while regrettable, does not suggest cruelty, or that the procedure at issue gives rise to a `substantial risk of serious harm.'" Id. at 1531.

Technical Errors
Schwab lists three areas of concern which, he contends, require the Court to take a closer look at the Florida protocol, alleging it fails to meet the standard of Baze. He first addresses "technical errors" that have allegedly occurred in actual past executions, such as irregular IV placements and multiple needle punctures indicating failure to gain IV access at the initial site. These alleged errors are not newly discovered evidence but could have been and were the subject of prior motions. Additionally, Schwab fails to explain how these "anomalies" relate to a Eighth Amendment claim. As the Court *927 noted in Lightbourne, and as anyone who has spent time in a hospital knows, problems inserting IV lines are common even under the best of medical circumstances. Id. at 348. Being pricked numerous times in the course of having an IV inserted is not cruel and unusual punishment, however uncomfortable it may be.
Schwab claims that a critical distinction exists between the approved Kentucky procedures and the Florida protocol when it comes to training for IV insertions and that errors in the recent mock executions demonstrate DOC's inability to perform an execution without creating a risk of harm. Schwab has not provided the Court with a copy of the Kentucky protocol, leaving the Court to assess that protocol as described in Baze. Kentucky procedure requires that the execution team participate in at least ten mock executions a year and those practices include the actual insertion of IV lines into volunteers. Florida, on the other hand, apparently does not actually insert IV lines during training Lightbourne at 349. However, the Florida personnel inserting IVs during execution must be phlebotmotists certified by a national certification agency or emergency medical technicians or paramedics certified under Chapter 401, Florida Statutes. (Exhibit A, Defendant's Exhibit 2, Florida Lethal Injection Protocol, p. 2).
Additionally, Warden Cannon testified in the Lightbourne hearings that these certified persons must also be currently employed in their area of medical expertise and must perform their assigned functions in their daily duties Lightbourne at 349. These certified professionals are the very same type of certified professionals we assume have sufficient training to save our lives in a medical setting and the same type of professionals required in Kentucky. Baze at 1528. The Court does not find that the failure to utilize actual IV insertions during mock executions has a significant impact in creating a risk of harm. The persons chosen to insert IV lines must have appropriate certification and, according to Warden Cannon, significant on-going experience in IV technology as part of their daily duties. Obtaining volunteers for practice IV insertions is not an enforceable criteria, as it would depend on the existence of living volunteers willing to subject themselves to the procedure, something which cannot be guaranteed.
While the Florida protocol calls for training sessions to be held quarterly at a minimum, Warden Cannon testified that monthly training sessions are held and that team members practice their responses to problems that might arise. Lightbourne at 349. The protocol dictates that a practice execution will be conducted one week prior to the scheduled date of an execution and that all persons involved in the actual execution are to participate in this practice. This level of scheduled practices is substantially similar to the ten sessions conducted annually by Kentucky.
The critical point at which the Eighth Amendment comes into play in the course of a lethal injection is the point at which the second drug is administered. "[P]roper administration of the first drug, sodium thiopental, eliminates any meaningful risk that a prisoner would experience pain from the subsequent injections of pancuronium and potassium chloride." Baze at 1530. See also Lightbourne at 351. "if the sodium pentathol is properly injected, it is undisputed that the inmate will not feel pain from the effects of the subsequent chemicals." Thus, the critical Eighth Amendment concern is whether the prisoner has, in fact, been rendered unconscious by the first drug, not whether there are "`irregular IV placements,'" "surgical incisions," "multiple needle punctures" or even "subcutaneous *928 IV insertion," errors alleged by Schwab to have occurred in actual executions As to training exercises, where IVs are not actually inserted, the Court questions what criteria Schwab uses when he describes a training exercise as a "failed" one.
The Court will address assessment of consciousness further below It rejects the argument that the alleged error rate in the insertion of IVs, by itself, creates a substantial risk of serious harm, as did the United States Supreme Court when it concluded that "asserted problems relating to the IV lines do not establish a sufficiently substantial risk of harm to meet the requirements of the Eighth Amendment." Baze at 1533. Florida protocol with regard to the training and expertise of IV technicians is substantially similar to Kentucky procedures and does not create an "objectively intolerable risk of harm." Florida protocol provides an extra safeguard apparently not in the Kentucky procedure as it requires that, one week prior to the execution, an assessment is made of the defendant to determine appropriate IV access (Exhibit A, p. 5).

Duration of Execution
A second "error" problem in the execution process which Schwab alleges is the length of the execution process, which might lead to a "lingering death." He cites to the deposition of Dr. Dershwitz, an expert for the State in the Lightbourne hearing, who has allegedly stated an execution should take 11 minutes, while Florida's average is 138 minutes. Schwab's claim is either that the drugs are being administered improperly or that the high dosage of sodium pentathol used by Florida actually slows down the process of death. Again, this is not newly discovered evidence, as he is citing to executions which occurred before he filed his last motion. He does not demonstrate that the data he provides from Ohio and Georgia is newly discovered, as it related to executions occurring prior to this year.
Even assuming that some of the data is new, the Court does not view it as creating a constitutional challenge to Florida's protocol. The assertion that one expert determined an ideal time frame does not require the Court to stand over DOC personnel with a stopwatch. If it did, the Court suspects it could be accused of rushing executions and creating a greater risk of harm. The Court does not find where in Dr. Derschwitz's [Dershowitz's] testimony that he set the 11-minute standard and Schwab does not point it out in his Motion.
Concerning an appropriate dose of sodium pentathol the Court determines that there was testimony at the Lightbourne hearing that the higher dose of sodium pentathol used in the Florida protocol (five grams as opposed to three grams in Kentucky, two in Ohio and Georgia) may cause the subsequent drugs to act more slowly (Exhibit B, from Defendant's Exhibit 1, testimony of Dr Dershwitz, p. 32). But Dr. Dershwitz did not testify and Schwab does not claim that this actually results in any pain or risk of pain. Dr. Dershwitz testified that "once the thiopental [sodium pentathol] is administered, nothing that is done to the inmate after that is perceptible by the inmate." He also testified that once the first few hundred milligrams of sodium pentathol were administered, the onset of unconsciousness is typically between thirty and sixty seconds. (Exhibit B, pp. 33, 60). Even if Schwab is correct that the higher sodium pentathol dose used by Florida delays death, his motion does not allege that this dosage would fail to render him unconscious within seconds, thus eliminating any further Eighth Amendment concerns. What constitutes a correct dose of sodium pentathol is not a *929 matter which should be decided by a court of law. As the Baze court pointed out, the courts should not be transformed into boards of inquiry charged with determining "best practices" for executions. Id. at 1531. Again, the constitutional focus is unconsciousness, not the duration of the execution following unconsciousness.

Myclonic and Other Observable Movements
The third "error" problem alleged by Schwab is testimony from various witnesses that prisoners demonstrated various involuntary movements during their executions, including spasms and convulsions, which allegedly demonstrates that the second drug used in the lethal injection process, pancuronium bromide, is either not being properly administered or is not acting as predicted.
Again, this is not newly discovered evidence. In fact, this issue was at the heart of the investigation into the execution of Angel Diaz, who reportedly made movements and sounds after the point at which the sodium pentathol was supposed to have rendered him unconscious. The Governor's Commission on Administration of Lethal Injection and the Lightbourne trial court looked extensively into evidence concerning the execution of Diaz. The Commission found it could not reach a conclusion as to whether Diaz had suffered (cited in Lightbourne at 330). The trial court found that, despite the fact that the subcutaneous TV delayed drug absorption rates, the high level of sodium pentathol rendered Diaz "totally unconscious and insensate throughout the entire death process." Florida v. Lightbourne, in the Circuit Court for the Fifth Judicial Circuit, in and for Marion County, Case No. 1981-170 CF, Order dated September 10, 2007. The Florida Supreme Court, reviewing the Marion County evidence, stated, "it is disputed whether or not Diaz suffered pain." Lightbourne at 345.
Schwab cites to Dr. Dershwitz's testimony again Dr. Dershwitz indicated that the purpose of pancuronium bromide is to prevent involuntary physical movement. Therefore, Schwab concludes, the drug must not be administered properly, creating yet another "error" in the execution process. Schwab fails to note that Dr Dershwitz also testified that "movement does not reflect pain and this does not reflect consciousness." (Exhibit B, p. 60). Schwab alleges only that the failure to properly administer this drug "would result in a failure to prevent involuntary movements and hasten death," not that its administration or maladministration results in pain or a substantial risk of pain. He does not allege how the Florida protocol for the use of this drug is not substantially similar to Kentucky's and thus this claim must fail. Given the fact that the use of pancuronium bromide and its relationship to movement or pain has been extensively investigated in Florida and given the fact that Baze approved the use of this particular chemical, the Court concludes that further inquiry into this subject is neither necessary nor useful.

Assessment of Consciousness
As noted above, in terms of the Eighth Amendment, the critical point in the lethal injection process comes immediately prior to the injection of the second drug. The question is, has the condemned been rendered unconscious by the sodium pentathol? If so, then any meaningful risk of pain has been eliminated. Baze at 1530.
Under the Kentucky protocol approved by the United States Supreme Court, an assessment of consciousness is apparently not written into the procedures. Justice Ginsberg, in her dissent in Baze, noted that there seems to be the lack of such a safeguard in the Kentucky procedures at *930 this point. She cited favorably to the Florida procedures, which do contain specific written directions for the execution procedure to pause for an assessment of unconsciousness. Baze, J. Ginsberg, dissenting at 1571.
Baze did not find a constitutional problem with the assessment of consciousness by a lay person without the use of particular medical equipment suggested by petitioners. In discussing the assessment of consciousness, it reiterated that "a proper dose of sodium thiopenthal [thiopental] obviates the concern that a prisoner will not be sufficiently sedated." It found no constitutional violation in the use of a lay "rough and ready" testwhich would include such measures as eyelash touching and calling the person's name. Id. at 1536.
Lightbourne reports the testimony of an expert who stated that a basis neurological assessment of consciousness can be taught to lay persons and that paramedics and EMTs know this "extremely fundamental" technique. Warden Cannon testified that the team warden would apply these basic techniques, which include eyelash touch, shaking the inmate and calling his name. Under the current protocol, the team warden will consult with the medical members of the execution team in making his assessment of unconsciousness. Id. at 347-348. The Florida Supreme Court found that Lightbourne's objections to this method did not rise to the level of an Eighth Amendment violation. Id. at 351. The Court finds that the Florida protocol and methods of assessing unconsciousness are, at a minimum, substantially similar to Kentucky's as discussed in Baze, and, in fact, seem to provide a higher level of safety because of the written directive to halt the execution until a proper assessment is made.

Comparison of Florida and Kentucky Protocol
Schwab provided the Court with Ms. Arvizu's analysis of variations between Kentucky and Florida protocol on various issues but, as noted above, has not yet demonstrated this person is qualified to offer an opinion on this specific subject. Expert testimony is not required for the Court to compare the two sets of protocol Oddly enough, neither Schwab nor the State saw fit to include a copy of the Kentucky protocol as an exhibit.
In any event, in reviewing Defendant's Exhibit 8, Ms. Arvizu's analysis of the differences between the two State's procedures, the Court is not convinced that she has stated any variations that amount to constitutional errors. For instance, she states that the Kentucky protocol provides for ongoing psychiatric assessment of the condemned while Florida does not, but as Schwab is not making a complaint that he is incompetent to be executed, this difference is irrelevant here. She states that Kentucky provides for a second dose of sodium pentathol within one minute if the condemned has not been rendered unconscious, but the Florida protocol likewise has a backup dose of the drug to be used upon a finding that the first dose failed to render the condemned unconscious. (Exhibit A, p. 11).
Florida's procedures are very similar to the Kentucky procedures as discussed in Baze. A comparison, of the two demonstrates the following parallels (from Baze at 1528, Exhibit B, Florida Lethal Injection Protocol and Lightbourne at 346-349).
1. Kentucky A three-drug procedure of 3 grams of sodium thiopental, 50 mgs of pancuronium bromide and 240 milliequivalents of potassium chloride Florida. A three-drug procedure of 5 grams of sodium pentathol (the brand name of sodium thiopenal [thiopental]), *931 50 mgs of pancuronium bromide and 480 milliequivalents of potassium chloride.
2 Kentucky Between injections, the IV lines are flushed with saline to prevent clogging.
Florida Between injections, the IV lines are flushed with saline.
3. Kentucky IVs are inserted by certified phlebotomists and emergency medial technicians with at least one year of experience.
Florida IV IVs are inserted by certified phlebotomists or certified EMTs and paramedics whose are currently employed in the field and use their skills in their daily duties. After insertion of one IV line into each of the prisoner's arms (unless a medical check has revealed another site is necessary) a check will be made with saline solution to determine if the line is flowing correctly. A designated team member is responsible for continually monitoring the viability of the IV lines throughout the entire execution procedure by closed circuit TV.
4. Kentucky the facilities consists of an execution chamber, a control room with a one-way window and a witness room. The warden and deputy warden remain in the execution room with the prisoner.
Florida the facilities consist of an execution chamber, an executioner's room and a witness room. The team warden, one additional execution team member and an FLDE observer remain in the execution chamber. The executioner's room is secured and only specified personnel may remain in the room.
5. Kentucky the execution team delivers the drugs remotely from the control room through five feet of IV tubing.
Florida the executioner delivers the drugs remotely from the executioner's room through a length of TV tubing. The procedure for setting up the IV lines are covered, including the use of back-flow values, a clamp to regulate flow and a lure lock tip. Designated team members are responsible for determining that the tubing from the IV lines to the drip bags has not been compromised and are responsible for continuously monitoring the viability of the IV lines before and during the execution procedure.
6. Kentucky After one minute following administration of the First drug, the warden and deputy warden make a visual inspection for consciousness. If the prisoner is not unconscious, a second dose of sodium thiopental is administered.
Florida After the administration of the first drug, the warden makes an inspection for consciousness. He must determine, after a consultation with other team members, that the prisoner is unconscious. If not, the execution process is suspended and the TV access lines reassessed. Once it is determined that a viable IV line is available, the execution resumes and a second dose of sodium pentathol is administered. After that dose, the warden must again do an assessment of consciousness before proceeding.
7. Kentucky A heart monitor is attached to the prisoner. An electrocardiogram verifies his death.
Florida A heart monitor is connected to the inmate by a certified paramedic or EMT. One or more team members will be charged with observing the monitor and will be situated in the executioner's room. After the *932 monitor indicates a cessation of heart activity, a physician will examine the inmate to determine that death has occurred.
Carefully comparing the Florida protocol to Kentucky's as described in Baze, the Court finds them substantially similar Florida has several additional safeguards not mentioned in Baze. For example, the drugs used for execution must be prepared by a licensed pharmacist and, one week before execution, the inmate must be physically examined to determine whether there are issues which could compromise proper administration of the lethal injection process Schwab has failed to point out any significant differences that would impact an Eighth Amendment claim.

Suggested Alternatives
Baze held that a defendant cannot not succeed on an Eighth Amendment objection to a method of execution unless he can proffer a "feasible, readily implemented" procedure that would, in fact, "significantly reduce a severe risk of pain." Id. at 1532. Schwab's suggestions for remedying the alleged defects in the Florida system are not such procedures. His suggestions are additional training of DOC personnel and a reduction in the amount of sodium pentathol.
As discussed above, the Court does not believe it is a judicial function to determine the appropriate dose or identity of the chemicals used in the lethal injection process. Lightbourne reiterated the principal enunciated in Sims v. State, 754 So.2d 657, 670 (Fla.2000) that "determining the methodology and the chemicals to be used are matters best left to the Department of Corrections." It also stated, "Our precedent makes it clear that this Court's role is not to micromanage the executive branch in fulfilling its own duties with relating to executions." Id. at 351. Baze reinforces that principal, advising that the courts should not be asked to become boards of "best practices."
That same principal would apply to the oversight of DOC training. Like the United States Supreme Court, this Court assumes that the agencies charged with developing execution procedures have "an earnest desire to provide a progressively more humane manner of death." Baze at 1531. At oral argument, Schwab's counsel made it clear that he was asking the Court to go behind the protocol and assess DOC's readiness to carry out an execution properly He stated, "It's the training. [T]he issue is the proficiency of the DOC training" (Exhibit C, transcript of June 24.2008 hearing, p. 30). Schwab's complaint all along has been that DOC personnel is inadequately trained, the Court has previously denied a hearing on this issue.
Baze concerns itself with the procedures as described on the face of the Kentucky protocol. The petitioners argued that one basis for finding Kentucky protocol unconstitutional was "because of the risk that the protocol's terms might not be properly followed." Id. at 1529. Justice Roberts concluded that the "risks of maladministration cannot remotely be characterized as `objectively intolerable.'" Id. at 1537. The Court finds no language in Baze that suggests it should look behind the protocol to micromanage the training of DOC personnel. To allow Schwab to force court oversight of DOC training and review of mock execution records would open the door for all condemned inmates to seek such a review prior to their executions, improperly involving the courts in a continuous, on-going monitoring of executive functions.
Baze soundly rejected petitioner's arguments that the possibility of a malfunction *933 in the protocol created an Eighth Amendment claim. It stated,
A stay of execution may not be granted on grounds such as those asserted here unless the condemned prisoner establishes that the State's lethal injection protocol creates a demonstrated risk of severe pain. A State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard. Id. at 1537 (emphasis added).
Schwab has not demonstrated that the Florida protocol is not substantially similar to the one approved by the United States Supreme Court or that this protocol creates a demonstrated risk of severe pain.
THEREFORE, it is ORDERED and ADJUDGED.
The Defendant's Third Successive Motion to Vacate Sentence or Stay Execution is DENIED.
The Clerk of the Court shall immediately transport the record of these proceedings to the Supreme Court of Florida No Notice of Appeal shall be required.
DONE AND ORDERED in Titusville, Florida this 25 day of JUNE, 2008
/s/ Charles M Holcomb
Charles M. Holcomb
Circuit Court Judge