*786 PER CURIAM.
This case is before us on the State’s appeal from an order granting a new penalty phase based on the defendant’s motion to vacate a sentence of death under Florida Rule of Criminal Procedure 3.851 and the defendant’s cross-appeal from the trial court’s order denying a new trial as to both the guilt and penalty phases. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons addressed in this opinion, we reverse the trial court’s order granting a new penalty phase, affirm the trial court’s order denying an entirely new trial, and reinstate the defendant’s sentence of death.
I. BACKGROUND
Thomas D. Woodel was convicted in Polk County, Florida, for the first-degree murders of Clifford and Bernice Moody, an elderly married couple, who he cut and stabbed. Woodel, who was twenty-six years old on the date of the crimes, was also convicted of burglary and robbery in the same case. The pertinent facts pertaining to Woodel’s convictions are addressed in our decision issued in his first direct appeal:
Clifford Moody, who was seventy-nine years old, and his seventy-four year old wife, Bernice, lived in a mobile home trailer on lot 533 at Outdoor Resorts of America in Polk County. The Moodys owned another trailer on adjoining lot 532, which they sometimes rented. Bernice was seen by the newspaper delivery man cleaning lot 532 about 4:30 to 4:45 a.m. on December 31, 1996. Clifford was last seen by a security person at the Outdoor Resorts Laundromat at about 5:30 a.m. The Moodys were preparing to show the mobile home for rental that day.
The Moodys were found dead a little after 1 p.m. on December 31,1996. Clifford was found lying on his back in the dining room area of the trailer on lot 532. His underwear and pants had been pulled down to below his knees. His eyeglasses lay approximately two feet from his head. Dr. Alexander Melamud, the medical examiner, testified that Clifford received a total of eight stab wounds, causing more internal than external bleeding, and that he died as a result of these stab wounds close in time to his wife’s death.
Bernice was found in the same trailer with multiple stab wounds. She lay dead on a bed in the back of the trailer and was nude except for one sock. A nightgown and female underwear with a knot tied in it lay on the floor next to the bed. Additionally, pieces of a porcelain toilet tank lid were found underneath her. Dr. Melamud testified that Bernice incurred a total of fifty-six cut or stab wounds, many of which on her right arm he opined to be defensive. Her jugular vein had been slit. Additionally, she had received significant blunt trauma injuries to her head, and her nasal bones were fractured. Dr. Melamud testified that Bernice died as a result of her injuries sometime in the early morning hours of December 31, 1996. No semen was detected on Bernice.
With the permission and assistance of Outdoor Resorts, detectives searched the park’s dumpsters the morning of January 3, 1997. The dumpsters had not been emptied since prior to December 31, 1996. During the search, detectives found three garbage bags containing pieces of a porcelain toilet tank lid, a wallet containing Clifford’s identification and credit cards, keys with a tag stating “Cliffs keys,” glasses, bloody socks, paperwork with the address of lot 301, and paperwork bearing the names of the de *787 fendant and his son, Christopher Woo-del.
That afternoon, detectives went to lot 301. Woodel lived there with his longtime girlfriend, Christina Stogner, and his sister, Bobbi Woodel. Woodel and his sister signed consent forms to have their trailer searched. Stogner was out of town at that time. Also present that day at lot 301 was Gayle Woodel. Although not known at that time, it would later be discovered that Gayle married Woodel in 1989, and they had a son together, Christopher. Gayle and Woo-del separated in 1992 but never divorced. In 1996, Gayle and Christopher lived in North Carolina while Woodel lived in Florida. However, Gayle had just come to Florida from North Carolina so that Christopher could spend some time with Woodel. Gayle, Christopher, and two of Gayle’s friends were staying at Woodel’s trailer.
While some detectives searched the premises, Woodel agreed to be questioned by other detectives. As Woodel left with the detectives, Woodel went over to Gayle and whispered for her to get rid of the knife Woodel had hidden. Gayle told Woodel’s landlady and friend about the content of the communication. Gayle later told deputies as well.
The detectives gave Woodel Miranda warnings, and he consented to talk with them. He initially told the detectives that he had been home asleep at the time of the murders. After further questioning, Woodel began to write out a statement. He then stopped and confessed to killing the Moodys, whom he said he had never met. The detectives then tape-recorded Woodel’s confession. In this taped confession played for the jury, Woodel admitted to drinking with others that evening after work in the lot next to the Pizza Hut where he worked. Afterwards, Woodel walked to Outdoor Resorts, a little over a mile from the Pizza Hut. Woodel admitted to entering the Moody’s rental trailer early in the morning after seeing Bernice through the window. He said he went in to ask for the time. According to Woodel, Bernice was alone in the trailer. Upon seeing him, she came at him with a knife, over which Woodel soon gained control. He then proceeded to stab her many times and hit her over the head with a porcelain toilet tank lid one to three times. The toilet lid shattered.
Clifford was last seen doing laundry at the Laundromat by security guard Elmer Schultz between 5:30 and 5:40 a.m. In his confession, Woodel said that he was leaving the trailer when Clifford came inside. Woodel then stabbed Clifford. As Clifford lay on the floor, Woo-del picked up a bucket and placed pieces of the shattered toilet tank lid in it. He also placed the knife along with several other items in the bucket. Woodel said that after stabbing Clifford, he took Clifford’s wallet.
Woodel also said in his confession that he threw some items into a canal in the mobile home park, threw some items away in his garbage, and hid the knife behind a dresser. Deputies would later find pieces of the toilet tank lid and Bernice’s eyeglasses in the canal, and a knife in Woodel’s room wedged between a wall and the dresser.
Woodel v. State (Woodel I), 804 So.2d 316, 319-20 (Fla.2001).
The jury voted twelve to zero for Mrs. Moody, and nine to three for Mr. Moody in recommending that Woodel be sentenced to death. Id. at 320. The trial court found the same aggravators[1] and miti- *788 gators[2] for both murders. Id. The trial court accepted the jury’s recommendations and imposed sentences of death for both murders. Id. On direct appeal, Woodel raised three guilt phase issues[3] and three sentencing phase issues.[4] Id. at 321. We affirmed the convictions, but vacated the sentences of death because the sentencing order failed to assign weights to the aggravating and mitigating circumstances. Id. at 327. The case was remanded with instructions “to reconsider the sentence.” Id,.
However, when the case returned to the circuit court in 2001, the original trial judge was unavailable to reconsider the sentence. Therefore, Woodel was granted a new penalty phase with a successor judge presiding. Woodel v. State (Woodel II), 985 So.2d 524, 527 (Fla.2008). At the conclusion of the second penalty phase, held in 2004, the jury recommended a life sentence for the murder of Mr. Moody, and recommended by a vote of seven to five that the sentence of death be imposed for the murder of Mrs. Moody. Id. After holding a Spencer hearing,[5] the sentencing court followed the jury’s recommendations, and imposed the sentence of death only for the murder of Mrs. Moody. Id. The sentencing court found the same four aggra-vators that were found in Woodel’s initial trial;[6] however, it found four statutory mitigators[7] and ten nonstatutory miti- *789 gators.[8] Id. On direct appeal, Woodel raised six claims.[9] Id. at 527-28. We determined that the sentence of death imposed on Woodel was proportionate to other cases in which the death penalty was imposed. Therefore, we affirmed Woo-del’s sentence of death. Id. at 532-34.
II. POSTCONVICTION PROCEDURAL HISTORY
In April 2010, Woodel filed a motion in the Circuit Court of the Tenth Judicial Circuit in and for Polk County, pursuant to rule 3.851, in which he sought postconviction relief. A second successor judge presided over the postconviction proceedings due to the unavailability of the circuit judge that presided over Woodel’s second penalty phase in 2004.
The postconviction court ruled that an evidentiary hearing was necessary to address Woodel’s allegations of ineffective assistance of counsel. The evidentiary hearing was held in 2011 over nine noneon-secutive days. Woodel presented twenty-seven witnesses, including his former trial attorneys, expert witnesses, and other witnesses. No witnesses appeared for the State.
Woodel presented seven general claims for postconvietion relief. In four of his claims, Woodel alleged that he was deprived of his constitutional right to reliable adversarial testing due to ineffective assistance of counsel.[10] Woodel sought a new guilt phase under Claim I, which con *790 sisted of four subclaims. He also sought a new penalty phase under Claim II, which consisted of seven subclaims. After the evidentiary hearing concluded, the post-conviction court entered an order that included the following judgment:
Therefore, it is ORDERED AND ADJUDGED that Defendant’s Amended Motion To Vacate Judgments of Conviction And Sentence, is DENIED with respect to his Claims that he is entitled to a new guilt phase trial. It is further, ORDERED AND ADJUDGED that the Defendant’s Amended Motion To Vacate Judgments of Conviction And Sentence, is GRANTED to the extent that he is entitled to a new penalty phase trial based on Ground IIA [Failure to conduct a reasonably competent mitigation investigation and failure to present mitigation], Ground IIB [Failure to ensure a reasonably competent mental health evaluation was conducted] and Ground IIC [Trial counsel failed to object to Arthur White’s testimony claiming that Woodel told him that he fondled Mrs. Moody] of his Amended Motion To Vacate Judgments of Conviction And Sentence.
State v. Woodel, No. CF97-00047A-XX (Fla. 10th Cir.Ct. Dec. 28, 2011). The postconviction court denied Woodel any relief for Claim I, subclaims E through G under Claim II,[11] and Claims III through VII.
III. DISCUSSION
On appeal, the State raises three general issues in which it asserts that Woodel failed to establish that: (1) he was prejudiced regarding his assertion that penalty phase counsel failed to investigate, prepare, and present a mitigation case in a proper manner; (2) penalty phase counsel allegedly failed to ensure that Woodel received a reasonably competent mental health evaluation; and (3) he was prejudiced regarding his assertion that penalty phase counsel should have moved to have certain testimony excluded that Woodel sexually fondled Mrs. Moody. We reverse the postconviction court’s order granting a new penalty phase, because Woodel failed to satisfy both prongs set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to obtain postconviction relief due to allegations of ineffective assistance of counsel where the death penalty has been imposed.
On cross-appeal, Woodel raises two general issues in which he asserts that: (1) guilt phase counsel provided ineffective assistance for failing to object to the admission of certain testimony that Woodel sexually fondled Mrs. Moody; and (2) the State violated the rules set forth in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194,10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). We deny Woodel’s cross-appeal claim that he is entitled to new guilt and penalty phases by affirming the portion of the postconviction court’s order that denied Woodel’s motion for a new guilt phase.
A. Ineffectiveness of Penalty Phase Counsel
1. Elements of the Claim
This Court has repeatedly upheld the Strickland standard in capital appeals that *791 address allegations of ineffective assistance of trial counsel:
Following the United States Supreme Court’s decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986) (citations omitted).
Williamson v. State, 123 So.3d 1060, 1065 (Fla.2013), cert, denied, — U.S.—, 134 S.Ct. 1519, 188 L.Ed.2d 454 (2014). When this Court has previously rejected a substantive claim on the merits, counsel cannot be deemed ineffective for subsequently failing to make a meritless argument. See Dennis v. State, 109 So.3d 680, 690 (Fla.2012) (citing Schoenwetter v. State, 46 So.3d 535, 546 (Fla.2010)).
2. Standard of Review
In applying the Strickland standard where the defendant who was convicted in a capital case alleges ineffective assistance of counsel, this Court employs a mixed standard of review. We defer to the circuit court’s factual findings that are supported by competent, substantial evidence, but review the circuit court’s legal conclusions de novo. See Anderson v. State, 18 So.3d 501, 509 (Fla.2009) (citing Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004)).
There is a strong presumption that trial counsel does not provide ineffective assistance. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052. “A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.” Id. at 689,104 S.Ct. 2052. The defendant carries the burden to “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ ” Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). “Judicial scrutiny of counsel’s performance must be highly deferential.” Id.
3. Merits
a. Penalty phase counsel allegedly provided ineffective assistance by failing to properly investigate, prepare, and present a mitigation case.
The postconviction court’s 2011 order stated the following regarding Woodel’s Claim IIA — Counsel’s failure to conduct a reasonably competent mitigation investigation and failure to present mitigation:
The Defendant asserts in his Amended Motion, “Because Mr. Woodel’s attorneys failed to conduct a reasonably competent investigation of Mr. Woodel’s background, they failed to present reasonably available mitigation to the jury and to link it to the crimes, including giving adequate weight to the statutory mental mitigators.”
[[Image here]]
*792 In preparing this Order, the [postconviction court] was particularly concerned with how [trial] counsel used the experience of the 1998 penalty phase in preparation for the 2004 penalty phase.
[[Image here]]
In Wiggins v. Smith, [539 U.S. 510, 521, 128 S.Ct. 2527, 156 L.Ed.2d 471 (2003),] the [United States Supreme Court] went on to say, “In assessing the reasonableness of an attorney’s investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further....”
In preparation for the [s]econd penalty phase, Mr. Colon talked to three family members.... He did not go to North Carolina or Michigan and he did not hire an investigator to do so. All he did was review records and proceed with the same type of defense.... [Colon] acknowledged on redirect [examination by postconviction counsel] that it may have been a bad decision....
In 2011, the postconviction court expressed concern about how counsel used the experience of the 1998 penalty phase in preparation for the 2004 penalty phase.
Although the sentencing order resulting from the penalty phase in 1998 was vacated by our decision in Woodel I, the continuity of certain aspects of counsel’s performance during both the 1998 and 2004 penalty phases has relevance to the issues raised in this appeal. We address, without applying hindsight, the consequences of counsel’s alleged failure to investigate, prepare, and present a proper mitigation case. Strickland, 466 U.S. at 689, 104 S.Ct. 2052 (“A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight....”); Cherry v. State, 659 So.2d 1069, 1073 (Fla.1995) (“The standard is not how present counsel would have proceeded, in hindsight....”).
During the 2011 evidentiary hearing, the postconviction court heard testimony from multiple experts and other witnesses concerning the relevant aspects of Woodel’s background. The experts offered their opinions about Woodel’s mental and emotional condition at the time of the crimes. Within its final order, the postconviction court expressed concern that former counsel Gilberto Colon inadequately prepared for the 2004 penalty phase.
The postconviction court concluded that penalty phase counsel’s performance during Woodel's 2004 penalty phase was unreasonable under the prevailing professional norms for counsel representing defendants in capital cases wherein the sentence of death has been imposed. As counsel for Woodel during the 2004 penalty phase, Colon had a duty to act reasonably by investigating available mitigation or to make an informed decision as to why such investigation was not necessary. See Strickland, 466 U.S. at 691, 104 S.Ct. 2052; Coleman v. State, 64 So.3d 1210, 1217 (Fla.2011) (“Under [,Strickland ], ‘counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.’ ”) (quoting Strickland, 466 U.S. at 691, 104 S.Ct. 2052).
In light of the circumstances presented in this case, we determine that there is no need for us to address whether counsel’s performance was deficient during the penalty phase, as it pertains to his failure to investigate, prepare and present a proper mitigation case. Instead, we conclude that Woodel cannot demonstrate that he is entitled to a new penalty phase because he failed to establish prejudice under the second prong of the Strickland standard. See *793 Williamson, 123 So.3d at 1065; Davis v. State, 928 So.2d 1089, 1105 (Fla.2005) (quoting Maxwell, 490 So.2d at 932); Waterhouse v. State, 792 So.2d 1176, 1182 (Fla.2001) (“[B]ecause the Strickland standard requires establishment of both prongs, when a defendant fails to make a showing as to one prong, it is not necessary to delve into whether he has made a showing as to the other prong.”). Furthermore, we see nothing in the record before us that undermines our confidence in the outcome of Woodel’s penalty phase. See Sochor, 883 So.2d at 771 (citing Strickland, 466 U.S. at 694, 104 S.Ct. 2052).
In 2011, Colon testified at the postcon-viction evidentiary hearing that he defended Woodel during the penalty phases by emphasizing the following to the jury: (1) Woodel’s alcohol consumption was one of multiple factors involved with these crimes; (2) Woodel had no violent criminal record; (3) Woodel grew up in a family with deaf parents; (4) Woodel’s mother was abusive, neglectful, and provided a poor household environment; (5) Woodel and his sister stole food from the neighbors as often as possible; and (6) Woodel and his sister were placed by their parents in a children’s home for a period of years.
We observe at the outset that the late Dr. Henry Dee, a clinical psychologist and clinical neuropsychologist, provided expert testimony before the jury that addressed and augmented the referenced aspects of the defense that Colon presented. Furthermore, the substance of Dr. Dee’s expert opinions was directly reflected in the mitigating circumstances found by the sentencing court in 2004.
We find that the testimony provided by Dr. Dee during the 1998 trial and 2004 penalty phase is relevant in the present capital postconviction appeal. We have examined pertinent portions of the transcripts filed as part of the respective records in Woodel I and Woodel II, in which Dr. Dee appeared as an expert witness for the defense. The final order on review indicates that the postconviction court also reviewed Dr. Dee’s 2004 testimony:
The [cjourt is of the opinion after reading the trial transcript of Dr. Henry Dee from the 2004 penalty phase, that Dr. Dee made a determined effort to present as complete a mental health picture of the Defendant as possible. Considering his limited knowledge of [children of deaf adults] and the deaf culture, he did his best to try to convey to the jury how that factor impacted on Mr. Woodel.
See Order at 77-78. Because we determine it is relevant to the issues on appeal, we will address specific aspects of Dr. Dee’s testimony in our discussion below.
i. Counsel’s Alleged Failure to Explore Woodel’s Personal History and Family Background
Regarding Colon’s handling of the presentation of mitigating circumstances in 2004, the postconviction court found that “[a]ll [Colon] did was review records and proceed with the same type of defense.” The postconviction court also found that Colon conducted no additional investigation into Woodel’s background for mitigation.
Following the 1998 penalty phase, the jury recommended by a vote of nine to three that the sentence of death be imposed for Mr. Moody’s murder, and by a vote of twelve to zero that the sentence of death be imposed for Mrs. Moody’s murder. In the 1998 penalty phase, Woodel did not testify. During the first trial, the court found substantial mitigation — one statutory mitigator (no significant history of criminal activity) and seven nonstatuto- *794 ry mitigators[12] — which were contrasted by its finding of four aggravators.[13]
Dr. Dee’s testimony during the 1998 trial addressed Woodel’s background and immediate family history. In summary, Dr. Dee testified that he: (1) reviewed all of the discovery material; (2) learned some time after his initial interviews with Woo-del that both of his parents were deaf; (8) interviewed Woodel’s father, Albert Woo-del, his sister, Bobbi Woodel, his aunt, Margaret (Becky) Russell, his coworker Leola Kilbourn, and Kilbourn’s daughter, Lisa; (4) learned from Woodel “the reason [Woodel’s mother Jackie] wasn’t here is that, after all, she has her own life. And [Dr. Dee couldn’t] imagine a time in his life when [Woodel] needed his mother more than he does right now. And she’s not here and [Dr. Dee] can’t get in touch with her. I guess that’s the way life had been for him”; (5) pointed out that because he was the eldest child, Woodel was born into a different household than Bobbi — i.e., Woodel was the only hearing person in his immediate family until Bobbi was born; (6) noted that Woodel had a tendency to sign while he spoke, signing is a “terribly different [language than] ours”; (7) learned from Woodel that his mother was not accepted by other people (family members described her as psychotic and his friends made fun of her); and (8) described Woo-del’s household as filled with domestic violence, child abuse and neglect, and alcohol and drug abuse.
The record shows that Woodel’s former defense lawyers testified that they presented to the jury essentially the same mitigating circumstances in the 2004 penalty phase, including Dr. Dee’s expert testimony, as they presented during the 1998 trial. The only exception to the same mitigation case was that Woodel testified for the first time during the 2004 penalty phase. We observe that Dr. Dee’s 2004 testimony revisited certain points that he made during Woodel’s 1998 penalty phase.
We find it significant that during Woo-del’s second penalty phase, Dr. Dee testified before the jury that he: (1) reviewed the discovery material obtained from the public defender’s office — comprising investigation notes, summaries of the crime investigators and a copy of the taped confession; (2) interviewed Woodel’s father, his sister, his aunt and two or three coworkers of Woodel’s from Pizza Hut for an estimated four hours; (8) met with Woodel at least seven times for an estimated total of twelve hours; (4) spent a great deal of time with Woodel trying to understand the impact that belonging to a mother-father deaf household had on him; and (5) discussed various other pertinent aspects of Woodel’s personal history and family background.
Notwithstanding the substantial mitigating circumstances that the trial court found during Woodel’s 2004 penalty phase, the postconviction court concluded that penalty phase counsel provided ineffective assistance to Woodel because counsel neglected to explore other available mitigating circumstances. We agree that counsel failed to explore other mitigation about Woodel’s personal history and his multi-generational family background. And, it is evident from the postconviction evidentiary record that counsel did not explore Woo-del’s background stemming from his childhood years in Michigan and North Carolina even though such information could have been presented to the jury. However, we respectfully disagree with the post-conviction court’s legal conclusion that Woodel was prejudiced under the Strick *795 land standard because the additional potential mitigating circumstances were of relatively minor importance and, therefore, the lack thereof does not undermine our confidence in the outcome of Woodel’s 2004 penalty phase.
A review of Dr. Dee’s unimpeached, expert testimony before the jury in 2004 demonstrates to our satisfaction that Woo-del’s troubled background was comprehensively presented to the jury. Dr. Dee discussed at length various aspects of Woodel’s background including his status as a mother-father deaf person, the pronounced dysfunction of his immediate family’s household, and his history of alcohol and drug abuse that began at a very early age. The jury was presented with expert testimony explaining the dynamics of Woo-del’s personal history and family background. The jury also heard Woodel’s testimony that provided information consistent with Dr. Dee’s expert opinion.
Consequently, we are satisfied that the jury received a thorough presentation of Woodel’s life history and his relevant family background. We further conclude that the presentation of Woodel’s personal history and family background was instrumentally accomplished through the extensive expert testimony provided by Dr. Dee. We also note that Dr. Dee’s testimony provided key testimonial evidence for the sentencing court’s findings of the existing mitigating circumstances related to Woo-del’s personal history and family background. In 2004, Dr. Dee’s testimony was informative and persuasive to the trier of fact.
Accordingly, we find that Woodel was not prejudiced by counsel’s alleged failure to investigate, prepare, and present additional and relatively minor mitigation stemming from Woodel’s personal history and family background. See Carratelli v. State, 961 So.2d 312, 324 (Fla.2007) (“Under Strickland, to demonstrate prejudice a defendant must show that there is a reasonable probability — one sufficient to undermine confidence in the outcome — that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.”) (citing Strickland, 466 U.S. at 694,104 S.Ct. 2052).
ii. Counsel’s Alleged Failure to Consult with an Expert on the Effects of Alcohol Consumption
Next, Woodel alleges his trial counsel was ineffective because he chose not to present expert testimony to explain to the jury the cognitive effects of alcohol abuse beginning at an early age, and how alcohol affected him physically and mentally throughout his life. In support of his claim, Woodel asserts that Colon should have presented an expert who could explain that due to Woodel’s blood alcohol level, he was in a partial alcohol-induced blackout at the time, of the murders. Woodel further asserts that given the fact that the jury voted seven to five in its recommendation that a death sentence be imposed, it is plausible that with additional mitigation testimony from an expert on alcohol consumption, the balance of aggravating and mitigating circumstances would have been different.
Colon testified on cross-examination during the 2011 evidentiary hearing that he did not consider using a toxicologist or a similar type of expert to explain to the jury the effects of alcohol or to calculate Woodel’s blood alcohol level at the time of the crimes. Colon testified as follows:
Well, my opinion, we live in Polk County and I knew that at least a good portion of those jurors knew what [it] is to be drunk, so I knew what a drunk person does when they’re — when they’re drunk, such as do stupid things, have memory loss, things of that nature. So no, it never crossed my mind to get an expert *796 to determine his blood alcohol or to get testimony....
In responding to whether there were any foreseeable, negative consequences of presenting an expert on the effects of alcohol, Colon further testified that “when you start producing experts in every piece of the defense, I call that shotgun defense and now the jury starts questioning the validity of the actual defense.”
The State contends that Colon’s decision not to use an expert on the effects of alcohol should be viewed as a strategy that adhered to his theory for the 2004 penalty phase. The State points out that Colon testified that he wanted to humanize Woo-del — by presenting to the jury that Woo-del’s alcohol consumption was only one of several factors involved in his commission of the crimes.
The record in this case shows that Colon testified that he did not remember all of the circumstances involving his decision not to present expert testimony concerning the effects of Woodel’s alcohol consumption. And, the record is silent about whether the non-use of an expert on the effects of alcohol consumption was a strategic decision by Woodel’s defense team. But see, e.g., Davis v. State, 928 So.2d 1089, 1119 (Fla.2005) (finding counsel’s strategy to preserve first and last closing arguments reasonable); White v. State, 559 So.2d 1097, 1100 (Fla.1990) (denying ineffectiveness claim that was based on counsel’s unconventional courtroom actions that were attributed to trial strategy). Nevertheless, we decline to address whether Colon’s performance is deficient under the first prong of the Strickland standard.
Instead, we conclude that Woodel was not prejudiced under the Strickland standard. Even if Colon’s failure to present testimony from an expert on alcohol consumption constituted error, such error was harmless beyond a reasonable doubt. See Mendoza v. State, 87 So.3d 644, 660-61 (Fla.2011) (“The test for harmless error is whether there is a reasonable possibility that the error affected the verdict.”) (citation omitted). We find that there is insufficient support in the record for recognizing a reasonable probability that, had counsel presented testimony from an expert on the effects of alcohol consumption, the trier of fact would not have decided the death penalty was appropriate. See Rhodes v. State, 986 So.2d 501, 512 (Fla.2008) (“If counsel’s failure to present the mitigating evidence was an oversight, and not a tactical decision, ‘then a harmlessness review must be made to determine if there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.’ ”).
We observe that during the 2004 penalty phase Dr. Dee testified, as he did during Woodel’s first trial,[14] about how he as *797 sessed Woodel’s self-described excessive alcohol consumption during the period of the crimes:
Q. [Mr. Colon] As to the actual murders themselves, did you talk to the defendant in your discussions with him to find out what he said actually occurred [in those] early morning hours? Did you go through and try to elicit from him his scenario of what had happened?
A. Well, I had been instructed not to on the first occasion that I saw him if you’ll recall from the Public Defender’s Office. Later on when I went over the information with him, I mean after I started seeing him again, went over the statement that he gave to the police, basically I used that as an outline to interview him about it. And he just didn’t give me any other information about it[.] [He] wasn’t able to so far as I was able to tell.
Q. So you gave him the opportunity to add to or take away from the statement he had given to the police?
A. Yeah. And he didn’t — as I recall, he didn’t tell me anything significantly different.
Q. Well, in the statement to the police, he told them that he had had maybe seven or eight beers to drink. Is that what he told you?
A. No, he did add to that. He told me that he had told the police he had seven or eight beers to drink but he actually had a lot more than that but he didn’t want to tell them that he drank any more because he didn’t want them to think, A, that he was drunk or, B, he was using it for an excuse.
Q. So he told you that he did lie to the police or at least attempt to?
A. Yeah, about that. Which is actually rather odd. Most people lie in the opposite direction when they’re looking for something exculpatory, you know. To excuse what they’re doing, they’ll say they drank more than they did. But he said he drank much less than he apparently did.
Dr. Dee explained, and during the 2004 penalty phase Woodel confirmed during his testimony, that Woodel substantially underrepresented to the police the actual amount of alcohol that he consumed on the night he murdered the Moodys. Woodel apparently under-represented how much he drank in the hours immediately before the Moody murders, because he had an inexplicable aversion to admitting to the detectives the actual amount of alcohol that he consumed. Thus, we observe that Dr. Dee’s 2004 testimony, in the context of his evaluation of Woodel’s psychological and emotional profile, provided the jury with information showing that Woodel had had problems with excessive alcohol consumption that he was dealing with at the time of the crimes. Dr. Dee’s testimony further addressed that in the period of his life prior to the Moodys’ murders, Woodel exhibited the behavior of an alcoholic. Colon recalled that he assessed during Woo-del’s trial that the jurors who lived in Polk County were aware that when someone gets drunk they have memory losses and “things of that nature.”
The postconviction evidentiary record shows that during the 2011 hearing Dr. Daniel Buffington, a clinical pharmacologist, provided his expert opinion about the effects alcohol had on Woodel’s behavior. From his interviews with Woodel, Dr. Buffington identified certain factors that put Woodel at risk for experiencing partial alcohol-induced blackouts — including family history, genetic predisposition, and binge drinking. Dr. Buffington assessed, as did Dr. Dee, that Woodel exhibited the signs of chronic alcoholism. Dr. Buffing-ton further testified that partial alcohol- *798 induced blackouts would have permitted Woodel to be functional, but experience memory loss of the events pertaining to the crimes. The record shows that Woo-del apparently only experienced memory loss about certain aspects of the crimes. For example, when being interviewed by detectives, Woodel stated that he could not remember: (1) how he wrested the serrated-edged knife (the murder weapon) from Mrs. Moody; (2) why her body was found completely nude, except for one sock; or (3) why her panties and nightgown had been wadded up and cast aside near the bed where her body was found.
However, it is evident from the record before us that Woodel was able to recall many pertinent details about the events pertaining to the Moodys’ murders during his recorded interview by police detectives. For example, Woodel described how he: (1) entered the Moodys’ residence without invitation in the hours before sunrise; (2) inflicted numerous stab and cut wounds on two elderly persons who were many decades older than he; (3) shattered a porcelain toilet tank lid over Mrs. Moody’s head to stop her from yelling; and (4) took items from the Moodys’ residence including Mr. Moody’s wallet, keys, and other items that did not belong to Woodel.
Even if Dr. Buffington’s testimony concerning Woodel’s probable alcohol-induced partial blackout, or some other comparable expert’s testimony had been presented to the penalty phase jury in 2004, we conclude that such expert testimony is not dispositive for establishing prejudice under Strickland. We determine that Woodel’s recorded interview with detectives, which was admitted into evidence, included statements that were sufficiently inculpatory regarding his convictions. Furthermore, Woodel’s recorded interview provided some of the direct evidence for the trier of fact’s finding of the weighty aggravating circumstances during Woodel’s second penalty phase in which the trial court imposed the sentence of death. See Sochor, 883 So.2d at 771 (“In the penalty phase context, ‘the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.’”) (quoting Strickland, 466 U.S. at 695, 104 S.Ct. 2052). Therefore, despite the relative validity of Dr. Buffington’s partial alcoholic blackout theory, as applied in Woodel’s case, the lack of such in-court expert testimony in 2004 does not undermine our confidence in the outcome of Woodel’s second penalty phase. At most, the lack of such expert testimony constitutes harmless error based on this record.
iii. Counsel’s Alleged Failure to Locate an Expert on Children of Deaf Adults (CODA)
Next, Woodel alleges his trial counsel was ineffective for failing to locate and consult with an expert on the deaf culture and its impact on CODA. According to Woodel, Colon’s reliance on Dr. Dee’s inadequate testimony about Woodel’s CODA status prejudiced him during the 2004 penalty phase. Instead, Woodel urges us to conclude that the testimony of CODA expert, Dr. Alan G. Marcus, during the 2011 postconviction evidentiary hearing demonstrates why Colon was ineffective regarding his failure to locate a CODA expert.
The postconviction evidentiary record shows that Dr. Marcus testified that there were numerous studies available about CODA in 2004. Dr. Marcus also testified that the scholarly book Dr. Dee read to provide consultation about CODA to Woo-del’s defense counsel in 1998 and 2004 was an anthropological study, not a psychological review. The postconviction court observed that: “[Dr.] Marcus concluded that *799 Dr. Dee did not totally understand the profound effect of having two deaf parents had on [Woodel].” The State argues that there is no showing that Colon could have readily uncovered a CODA expert in 2004.
In the 1998 and 2004 court proceedings, Dr. Dee provided extensive and unim-peached expert testimony about the deaf culture in general, and persons with “mother-father deaf’ status in particular. After reviewing Dr. Dee’s testimony, we determine that his reference to Woodel’s “mother-father deaf’ status is equivalent to the parties’ present discussion of Woo-del’s CODA status. In our view, Dr. Dee utilized his expertise and experience as both a clinical psychologist and clinical neuropsychologist to provide extensive testimony that was relevant in Woodel’s sentencing phase. In 1998, Dr. Dee testified that he performed independent research and also utilized the assistance of a professional librarian to familiarize himself with the deaf culture and mother-father deaf subculture. In 2004, Dr. Dee again testified about his additional research into the deaf culture; he also discussed his understanding of the mother-father deaf subculture.
Given the quality of testimony Dr. Dee provided to the jury in 2004, we determine that the jury was presented with a reasonably clear description of Woodel’s background in a mother-father deaf household, and his life within the deaf culture. Notwithstanding that the prevailing terminology has apparently been most recently designated as CODA, the jury was presented with relevant expert testimonial evidence from Dr. Dee concerning Woodel’s CODA status during the 2004 penalty phase. We note that the sentencing court found the nonstatutory mitigating circumstance that his parents were deaf and spoke primarily in sign language — giving that factor moderate weight. We conclude that the trier of fact had a sufficiently thorough presentation about the mitigating circumstances that existed concerning Woodel’s status as a CODA and, therefore, our confidence in the outcome of the penalty phase has not been undermined regarding this subclaim based on counsel’s failure to present cumulative mitigation.
b. Penalty phase counsel allegedly provided ineffective assistance by not ensuring that Woodel received a reasonably competent mental health evaluation.
The postconviction court’s order made the following findings and conclusion of law regarding Woodel’s Claim IIB— Counsel’s failure to ensure a reasonably competent mental health evaluation:
The Defendant alleges that[:] Counsel failed to ensure that Mr. Woodel received reasonably competent mental health evaluation and failed to retain reasonably qualified experts to determine the extent of Mr. Woodel’s mental, emotional and psychological deficits due to his neglect and the abuse he suffered throughout his childhood....
... At the evidentiary hearing, Dr. Cunningham, a clinical and forensic psychologist, testified extensively about the factors that put someone at risk for alcohol and drug abuse, and how those factors could be applied to Mr. Woodel. Dr. Daniel Buffington, a clinical pharmacologist testified at the evidentiary hearing regarding alcoholic blackouts and cognitive and physical effects of alcohol consumption [and calculated that Woo-del consumed] between 12 and 24 beers. Dr. Alan G. Marcus, a Clinical Psychiatrist who works with deaf and hard of hearing adults and families, including CODAs [children of deaf adults], discussed the deficiencies in Dr. Dee’s presentation with respect to the special problems faced by Mr. Woodel as a *800 CODA.... Considering [Dr. Dee’s] limited knowledge of CODA and the deaf culture, he did his best to try to convey to the jury how that factor impacted on Mr. Woodel.
... The [postconviction court] finds that [trial] counsel’s performance fell below an objective standard of reasonableness with respect to Claim IIB of the Defendant’s Motion. The [postconviction court] finds that but for this deficient performance there is a reasonable probability that the result of the proceedings would have been different, and Mr. Woodel may have received a life recommendation.
The postconviction court considered testimony from three experts (Drs. Cunningham, Buffington, and Marcus) in drawing its conclusion that trial counsel failed to ensure that Woodel received a reasonably competent mental health evaluation. However, the postconviction court did not explain how such expert testimony influenced its conclusion that Woodel was prejudiced by Colon’s alleged professional errors during the 2004 penalty phase. And, the postconviction record provides insufficient testimonial evidence from the identified experts that trial counsel failed to ensure Woodel had a proper mental health evaluation in preparation for trial.
Colon testified during the postconviction evidentiary hearing “that there was no testimony or evidence available that Mr. Woo-del had any mental illness.” Colon further testified that “Dr. Dee looked for [any mental illness] but came up empty.” Colon further testified that “growing up in the family that [Woodel] grew up [in] and the environment that he grew up in may have provided a basis for this, but Dr. Dee could not pinpoint that.”
The record filed along with Woodel’s previous appeals to this Court also shows that Dr. Dee examined and performed the mental health evaluation of Woodel for the defense. Dr. Dee also provided multi-fac-eted information about Woodel’s life history within his report to Woodel’s defense team. The postconviction court did not state why Colon’s reliance on Dr. Dee’s mental health evaluation of Woodel, in lieu of obtaining such an evaluation by another mental health clinician, resulted in Woodel receiving an unreliable penalty phase in 2004.
Based on the evidence presented to the jury, including information provided from Dr. Dee’s mental health evaluation of Woo-del, the sentencing court found extreme emotional disturbance as a statutory mitigating circumstance and accordingly assigned it little weight. Furthermore, the experts that testified during the postcon-viction evidentiary hearing addressed issues that had been previously identified and given weight as mitigating circumstances during Woodel’s 2004 penalty phase: (1) Drs. Cunningham and Buffing-ton identified certain risks associated with Woodel’s alcohol and drug abuse — this circumstance was found as the statutory miti-gator of substantial impairment of capacity to appreciate his actions or conform his conduct to the requirements of law (given little weight), and nonstatutory mitigator abuse of alcohol and drugs (given little weight); and (2) Dr. Marcus opined that there were special psychological and emotional problems faced by CODA — this circumstance was found as the statutory miti-gator of extreme emotional disturbance (given little weight), and the nonstatutory mitigator of being a child of parents who were deaf and spoke primarily in sign language (given moderate weight). Based on the totality of the record, our confidence in the outcome is not undermined so as to establish prejudice, because there is no evidence that Woodel did not receive a *801 reasonably competent mental health evaluation in preparation for trial.
c. Penalty phase counsel allegedly provided ineffective assistance by failing to move to exclude testimony by Arthur White that Woodel sexually fondled Mrs. Moody.
The postconviction court’s 2011 order includes the following statements regarding Woodel’s Claim IIC — Counsel’s failure object to Arthur White’s testimony that Woodel fondled Mrs. Moody:
The [postconviction court] finds that counsel was deficient in the penalty phase in 2004 just as in 1998 with regard to not filing a motion to exclude this testimony. The prejudicial effect of this testimony regarding fondling far outweighed the probative value of the testimony. Because this was a death case, ... the [postconviction court] is concerned that but for this deficiency of [penalty phase] counsel the result of the 2004 penalty phase proceedings would have been different. The [postconviction court] finds that counsel’s performance fell below an objective standard of reasonableness with respect to Claim IIC of the Defendant’s Motion. The [postconviction court] finds that but for this deficient performance there is a reasonable probability that the result of the proceedings would have been different, and Mr. Woodel may have received a life recommendation.
The postconviction court found that Colon was deficient in the 1998 and 2004 penalty phases for not filing a motion to exclude White’s testimony because the prejudicial effect regarding fondling far outweighed the probative value. However, the State aptly points out that in Woodel II, we previously decided the issue of whether White’s challenged testimony should have been excluded at trial.
Woodel provides no direct authority as to why White’s statements would be improper other than alleging that this was irrelevant and highly inflammatory, constituting a nonstatutory aggravating circumstance. Section 921.141(1), Florida Statutes (2005), which governs the penalty-phase proceedings, provides in pertinent part that evidence “relevant to the nature of the crime and the character of the defendant” is admissible “regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements.” In this case, White’s statements regarding Woodel’s confession that he pushed Bernice into the bedroom and fondled her were relevant to the nature of the crime. Woodel failed to show a meritorious basis for excluding this testimony and clearly did not demonstrate why the admission of this evidence constituted fundamental error.
985 So.2d at 530. In Woodel II, we determined that White’s testimony was “relevant to the nature of the crime” and, therefore, Woodel cannot demonstrate prejudice regarding counsel’s failure to file a motion in limine.
4. Cumulative Analysis of the Allegations of Ineffective Assistance of Trial Counsel
The postconviction court found it unnecessary to perform a cumulative assessment of alleged trial counsel errors in light of its judgment that penalty phase counsel was ineffective. And, although neither party raises any cumulative effect of trial counsel errors on this appeal, we nevertheless address the reasons why there is no cumulative effect of the alleged errors entitling Woodel to relief due to ineffective assistance of trial counsel. See Anderson v. State, 18 So.3d 501, 520 (Fla.2009) (rejecting a claim of cumulative error *802 when appellant’s claims, addressed individually, did not establish ineffective assistance of counsel or that appellant’s constitutional rights were violated) (citing Israel v. State, 985 So.2d 510, 520 (Fla.2008)); Suggs v. State, 928 So.2d 419, 441 (Fla.2005) (stating the cumulative effect of evi-dentiary errors and allegations of ineffective assistance of trial counsel will be considered together).
First, we find no reasonable probability that the proposed additional mitigating circumstances pertaining to Woodel’s personal history and family background would have had any impact on the trier of fact, because such information would have been cumulative to evidence that was presented and the mitigating circumstances that were found during Woodel’s second penalty phase. See Rhodes, 986 So.2d at 512-13 (“Even if we were to find counsel’s conduct deficient, [the defendant] cannot demonstrate prejudice. Any testimony the additional witnesses would have provided would have been cumulative to that provided by the witnesses at resentencing.... The additional testimony would only have added to the mitigation already found. Even if given more weight, the mitigation would not outweigh the three strong ag-gravators ... ”) (citation omitted).
Next, the record reflects that, despite the lack of testimony from an expert on the effects of alcohol consumption, the trier of fact was able to understand from Dr. Dee’s testimony and other evidence that Woodel was an alcohol abuser who had difficulty dealing with his alcohol abuse during the period when he murdered the Moodys. Thus, even if counsel’s failure to present testimony from an expert on alcohol consumption constituted error, it was harmless error. See Floyd v. State, 850 So.2d 383, 408 (Fla.2002) (citing Whitton v. State, 649 So.2d 861, 864-66 (Fla.1994) (applying cumulative error analysis and determining there was no reasonable probability that the cumulative impact of harmless errors affected either the jury’s verdict or the defendant’s overall right to a fair trial)).
Next, we determine that there is no reasonable probability that additional testimonial evidence about Woodel’s CODA status from another expert would have changed the outcome of Woodel’s second penalty phase; therefore, our confidence is not undermined because such evidence would have been cumulative to what the trier of fact actually heard. See Butler v. State, 100 So.3d 638, 667 (Fla.2012) (“[W]here the additional mitigation is minor or cumulative and the aggravating circumstances substantial, we have held that confidence in the outcome of the penalty phase is not undermined.”) (citation omitted).
Next, the postconviction evidentiary record does not show that any expert explained why the mental health evaluation performed on Woodel for trial was not competent, or identified any previously undisclosed mental health issue that would have had a reasonable probability of changing the judgment of the trier of fact to impose the sentence of death. See Kilgore v. State, 55 So.3d 487, 504 (Fla.2010) (“Kilgore has failed to demonstrate that the proffered evidence [of failure to ensure an adequate mental health evaluation was performed for trial] had a reasonable probability of changing the outcome, which is a probability sufficient to undermine our confidence in the verdict.”).
Finally, Woodel’s allegation that trial counsel was ineffective for failing to move to exclude Arthur White’s testimony is unavailing. As noted above, in light of our decision in Woodel II, trial counsel cannot be deemed ineffective for declining to file a motion in limine concerning this claim.
*803 We find no cumulative error because the allegedly unexplored mitigating circumstances were: (1) cumulative to those presented during the second penalty phase; (2) insufficiently demonstrated during the postconviction evidentiary hearing; or (3) otherwise failed to satisfy the Strickland standard. See generally Bradley v. State, 33 So.3d 664, 684 (Fla.2010) (“Where, as here, the alleged errors urged for consideration in a cumulative error analysis ‘are either meritless, procedurally barred, or do not meet the Strickland standard for ineffective assistance of counsel[,] ... the contention of cumulative error is similarly without merit.’ ”) (quoting Israel, 985 So.2d at 520). Furthermore, because we do not find multiple errors in this case, there is no cumulative error effect that establishes prejudice. See Johnson v. State, 104 So.3d 1010, 1029 (Fla.2012) (“[BJecause multiple errors did not occur in this case, Johnson’s claim of cumulative error must fail.”). Despite the lower tribunal’s detailed order granting Woodel postconviction relief as to the penalty phase, most of its findings relate to its judgments about counsel’s deficiency, and there are only conclusory statements regarding prejudice.
In conclusion, we find the assertions that trial counsel’s professional errors deprived Woodel of a fair second penalty phase fail to satisfy the prejudice prong of the Strickland standard. Thompson v. State, 990 So.2d 482, 490 (Fla.2008) (quoting Strickland, 466 U.S. at 687, 104 S.Ct. 2052); see also Strickland, 466 U.S. at 700, 104 S.Ct. 2052 (“Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed.”). Accordingly, Woodel is not entitled to a third penalty phase.
B. Ineffectiveness of Guilt Phase Counsel (Cross-Appeal)
1. Merits
a. The postconviction court allegedly erred in finding that trial counsel’s failure to consult with an expert about the effects of alcohol did not prejudice Woodel during the 1998 guilt phase.
The postconviction court denied Woodel relief from ineffective assistance of counsel under this claim regarding his convictions during the 1998 guilt phase. The court below found that Allen R. Smith, guilt phase counsel, was deficient to the extent that Smith did not “at least consult with a toxicologist or similar type of expert to determine if such an expert could provide useful assistance to the defense with regard to [the defense’s] argument of voluntary. intoxication and lack of premeditation on part of the Defendant.” However, the postconviction court found no prejudice pursuant to the Strickland standard. Therefore, the postconviction court denied Woodel relief based on his allegation of ineffective assistance of counsel, because Woodel would still have been found guilty of first-degree felony murder. We agree.
Woodel’s argument that Smith provided ineffective assistance of guilt phase counsel for allegedly failing to consult with an expert on the effects of Woodel’s alcohol consumption is without merit. In our decision pertaining to Woodel’s first direct appeal, we acknowledged that the trial court specifically rejected the defense’s assertion that Woodel was so intoxicated that he could not form the intent to kill. See Woodel I, 804 So.2d at 321. And, we subsequently affirmed all of Woodel’s convictions on direct appeal, including those for the two counts of first-degree murder. Id. at 327. The record shows that there *804 was also legally sufficient evidence to support alternative convictions of Woodel for first-degree felony murder. Accordingly, the postconviction court’s order is affirmed to the extent it denies Woodel a new guilt phase based on Woodel’s claim that Smith was ineffective for failing to consult an expert on the effects of alcohol consumption. See Dennis v. State, 109 So.3d 680, 690 (Fla.2012) (citing Schoenwetter, 46 So.3d at 546) (stating trial counsel is not ineffective for failing to make a meritless argument).
b. The postconviction court allegedly erred in finding that trial counsel’s failure to object to Arthur White’s testimony did not prejudice Woodel during the 1998 guilt phase.
The postconviction court denied Woodel relief based on his allegation of ineffective assistance of counsel for failure to object to White’s testimony during the 1998 guilt phase. The lower tribunal concluded that there was no evidence presented during the 2011 evidentiary hearing to demonstrate that Smith was deficient for not filing a motion to exclude White’s testimony that Woodel admitted to sexually fondling Mrs. Moody. The postconviction court also concluded that there was no prejudice under the Strickland standard because the State’s case against Woodel “was very strong” and, thus, the results of the 1998 guilt phase proceedings would not have been different.
We have previously decided, for the reasons discussed above, that there was no showing that the admission of White’s testimony constituted fundamental error. Woodel II, 985 So.2d at 530. Accordingly, we now determine that Woodel is not entitled to any relief concerning his cross-appeal claim that Smith was ineffective for not making efforts to exclude White’s testimony about Woodel allegedly fondling Mrs. Moody because this claim is procedurally barred. Miller v. State, 926 So.2d 1243,1256 (Fla.2006).
C. Alleged Brady and Giglio Violations (Cross-Appeal)
The postconviction court found that Woodel did not prove any of his allegations that the State violated his rights under Brady or Giglio. We now address Woo-del’s specific Brady and Giglio cross-appeal claims in turn.
1. The postconviction court allegedly erred in finding that the State did not commit Brady violations in its presentation of Arthur White’s testimony.
a. Elements of the Claim
More than a decade ago, the Supreme Court of the United States reiterated that in order to establish a Brady violation, a defendant must show that there is evidence: (1) favorable to the defendant— either exculpatory or impeaching; (2) willfully or inadvertently suppressed by the State; and (3) that caused the defendant to be prejudiced, because it was material. See Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).
With regard to any alleged Brady claims, we have previously explained that the second prong of the analysis is not satisfied “where the information is equally accessible to the defense and the prosecution, or where the defense either had the information or could have obtained it through the exercise of reasonable diligence.” Floyd v. State, 18 So.3d 432, 451 (Fla.2009) (quoting Provenzano v. State, 616 So.2d 428, 430 (Fla.1993)). In addition, in order to establish the materiality of disputed evidence under the third prong of the Brady analysis, the defendant must demonstrate a reasonable probability that, had the evidence been disclosed to the defense, the jury would have reached a *805 different verdict. See Duest v. State, 12 So.Sd 734, 744 (Fla.2009). We have previously defined “reasonable probability” to be “a probability sufficient to undermine confidence in the outcome.” Id.
b. Standard of Review
This Court applies a mixed standard of review on postconviction Brady claims. See Griffin v. State, 114 So.3d 890, 905 (Fla.2013) (“Where the trial court has conducted an evidentiary hearing, this Court will defer to the factual findings of the trial court that are supported by competent, substantial evidence, but will review the application of the law to the facts de novo.”) (citing Sochor, 883 So.2d at 785 and Lowe v. State, 2 So.3d 21, 29 (Fla.2008)).
c. Merits
i. The State allegedly failed to disclose evidence in 2004 about White’s alleged deal with the State.
We find nothing in this record to contradict the postconviction court’s judgment that there was no evidence that White made a deal with the State to testify against Woodel. Thus, there is no showing that any evidence favorable to Woodel existed to satisfy the first prong under Brady for Woodel to obtain any relief. Accordingly, we affirm the postconviction court’s 2011 order denying Woodel relief.
ii. White’s allegedly false testimony about his felony conviction record.
The postconviction court denied relief under Brady, and we see nothing in the record that supports Woodel’s contention that the State violated the tenets of Brady regarding White’s allegedly false testimony. White’s prior felony conviction record was readily available to Woodel’s defense team and, therefore, White was subject to impeachment under cross-examination by the defense. Whether White was confused about the number of felony convictions that he had when he testified that the number “was about five,” or if he simply asserted untruths about his felony conviction record as being lesser in number than it actually was is inconsequential. The correctness of White’s testimony is not dispositive to our consideration of whether Woodel is entitled to any relief. Woodel fails to satisfy the second prong under Brady because the information about White’s felony convictions was not suppressible by the State. See Floyd, 18 So.3d at 451. Again, Woodel fails to establish sufficient proof for an element under the Brady standard to obtain relief. Accordingly, we affirm the postconviction court’s 2011 order denying Woodel any relief to the extent he alleges a Brady violation occurred with regard to White’s testimony about his prior felony conviction record.
2. The postconviction court allegedly erred in finding that the State did not commit Giglio violations in its presentation of Arthur White’s testimony.
a. Elements of the Claim
In previous cases, we have stated that whenever a claimant alleges that the prosecutor has acted in violation of Giglio, the claimant must show the following: (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew that the testimony was false; and (3) the false testimony was material. See Guzman v. State, 868 So.2d 498, 505 (Fla.2003) (citing Ventura v. State, 794 So.2d 553, 562 (Fla.2001)). With regard to the third prong of Giglio, “the false evidence is material ‘if there is any reasonable likelihood that the false testi *806 mony could have affected the judgment of the jury.’ ” Id. at 506 (quoting United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2892, 49 L.Ed.2d 342 (1976)). Under the Giglio analysis, once the defendant has established that the State knowingly presented false testimony, the State bears the burden of proving that the false testimony was not material. Id.; see also Johnson v. State, 44 So.3d 51, 64 (Fla.2010) (“Once the first two prongs are established, the State bears the burden of showing that the false evidence was immaterial by showing that its use was harmless beyond a reasonable doubt”).
b. Standard of Review
In our consideration of postconviction Giglio claims we apply a mixed standard to resolve questions of law and fact. See Johnson, 44 So.3d at 65 (“A court’s decision with respect to a Giglio claim is a mixed question of law and fact, and a reviewing court will defer to the lower court’s factual findings if they are supported by competent, substantial evidence, but will review the court’s application of law to facts de novo.”) (citing Sochor, 883 So.2d at 785).
c. Merits
i. The State allegedly presented false testimony from White.
There is simply no showing in the record that a deal was struck between White and the State regarding White’s testimony against Woodel. Here, Woodel urges us to infer that because White was an habitual felony offender, who had been in and out of prison for twenty-five years, White should not have been able to receive relatively lenient sentences for his then new convictions. In addition, Woodel asserts that White’s prison terms were to be followed by a moderate probation period. Woodel argues that the inexplicable leniency shown in White’s eventual sentencing evinces that White had a deal with the State to testify against Woodel. The Gig-lio standard requires that Woodel bear the burden of persuasion that White’s testimony at issue was false, and that the State knowingly presented White’s false testimony to a jury, without correction. Id. at 64. However, Woodel fails to carry his burden by his use of inductive reasoning with regard to White’s supposedly lenient sentences. Accordingly, we affirm the post-conviction court’s 2011 order to the extent it denies Woodel any relief pursuant to his allegation that the State violated Giglio concerning a supposed deal it made in exchange for White’s testimony against Woodel.
Woodel also alleges that White gave false testimony concerning his felony conviction record, and that the State failed to correct it. Assuming, arguendo, that Woodel can carry his burden under the first two prongs, we evaluate whether the State can carry its burden under the third prong of the Giglio analysis by showing that White’s allegedly false testimony was not material. Id.
The State argues that White’s testimony was not material because it is reasonable that the jury’s verdict would not have been affected by White’s allegedly false testimony. The State further argues that the jury was well aware that White had been in and out of prison during his then twenty-five-year history as a habitual offender; and that White was motivated to testify against Woodel, because he hoped to gain some benefit from his testimony.
We, therefore, conclude that the allegedly “false testimony” from White was not material in Woodel’s case because there is no reasonable possibility that the jury’s verdict was affected by White’s openly self-serving testimony. Accordingly, we *807 affirm the postconviction court’s 2011 order to the extent it denies Woodel any relief because there is no evidence establishing that the State violated Giglio regarding any allegedly false testimony provided by White.
IV. CONCLUSION
In reversing the postconviction court’s judgment that Woodel be afforded a new penalty phase, we briefly pause to reiterate our continual adherence to the general premise that the appellate courts of this State should give all due deference to the trial courts’ findings of fact that are based on competent, substantial evidence.[15] However, we respectfully disagree with the postconviction court’s conclusions of law concerning the issues raised by the State in this case.
We hold that Woodel is not entitled to any relief due to ineffective assistance of counsel under the Strickland standard. Accordingly, we reverse the postconviction court’s 2011 final order only to the extent the order affords Woodel a new penalty phase. In every other respect, we affirm the postconviction court’s order and, therefore, hold that Woodel is not entitled to any of the relief he seeks in his cross-appeal. Woodel’s sentence of death is hereby reinstated.
It is so ordered.
QUINCE, LABARGA, and PERRY, JJ., concur.
LEWIS, J., concurs in result.
CANADY, J., concurs in result with an opinion, in which POLSTON, C.J., concurs.
PARIENTE, J., dissents with an opinion.

. We previously stated:
In aggravation, the trial court found that:
*788 (1) the defendant had previously been convicted of another capital offense; (2) the killings were perpetrated while the defendant was engaged in a burglary; (3) the killings were especially heinous, atrocious, or cruel (HAC); and (4) the victims were particularly vulnerable due to advanced age or disability. The trial court specifically rejected that Clifford's murder occurred as a result of Woodel's effort to escape and avoid being arrested.
Id. at 320-21 (footnotes omitted).

. Similarly, we also stated:
The trial court found the statutory mitigator that Woodel had no significant history of criminal activity. The trial court also found seven nonstatutory mitigators: (1) Woodel was physically abused as a child; (2) he was neglected by his mother; (3) there was instability in his residences as a child; (4) both of Woodel’s parents were deaf and mute; (5) use of alcohol and drugs; (6) Woodel was willing to meet with the victim’s family prior to trial; and (7) he was willing to be tested for a possible bone marrow donation for his daughter, who had leukemia. The trial court specifically rejected a finding that Woodel was so intoxicated that he could not form the intent to kill.
Id. at 321.

. Woodel raised the following guilt phase issues:
Woodel argue[d] that: (1) his motions for judgment of acquittal should have been granted by the trial court regarding premeditation, robbery, and' burglary; (2) the trial court impermissibly allowed constructive amendment of the indictment; and (3) his mistrial motion should have been granted because the State made an impermissible reference to a marital communication in its opening statement.
Id. at 321 n. 7.

. Woodel raised the following sentencing phase issues:
Woodel argue[d] that: (1) the trial court committed reversible error for rushing the penalty phase; (2) the trial court erred in finding the burglary and advanced age ag-gravators; and (3) the trial court erred in evaluating the mitigation evidence.
Id. at 321 n. 8.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. The sentencing court found four aggravating circumstances (prior violent felony conviction; committed during commission of a burglary; especially heinous, atrocious or cruel (HAC); and victim vulnerability due to age or disability). Woodel II, 985 So.2d at 527.

. The sentencing court found "four statutory mitigators (no significant criminal history; defendant’s age; substantial impairment of capacity to appreciate his actions or conform *789 his conduct to the requirements of law; and extreme emotional disturbance).” Id.

. The sentencing court further found
ten nonstatutory mitigators (physical abuse as a child; neglect and rejection by his mother and others; an unstable home as [a] child; parents who were deaf and spoke primarily in sign language; abuse of alcohol and drugs; willingness to meet with the victims’ daughter; willingness to be tested for bone marrow donation for his daughter; the defendant's belief in God; his voluntary confession; and the defendant's compassion for others).

Id.

. Woodel's claims on direct appeal consisted of the following:
(1) the trial court erred in excusing for cause two jurors who were not sufficiently fluent in the English language without the aid of an interpreter; (2) fundamental error occurred when the jury heard and considered prejudicial testimony from a State witness; (3) the trial court erred in finding the aggravating factor of “vulnerability due to advanced age or disability” with regard to the murder of Bernice Moody; (4) Woodel’s sentence of death is not proportional; (5) Woodel is entitled to a life sentence because Florida's death penalty law violates his right to due process, and his right to trial by a jury; and (6) execution by lethal injection constitutes cruel and unusual punishment.
Id. at 527-28.

.In his initial motion for postconviction relief, Woodel sought relief under the following general claims: Claim I — Deprivation of the right to reliable adversarial testing due to ineffective assistance of counsel during the guilt phase; Claim II — Deprivation of the right to reliable adversarial testing due to ineffective assistance of counsel during the penalty phase; Claim III — Deprivation of the right to due process to develop factors in mitigation because the psychologist engaged by the defense failed to conduct appropriate tests for brain damage or mental illness; Claim IV — Violation of the rules set forth in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); Claim V — Deprivation of a fair trial due to cumulative procedural and substantive errors; Claim VI — Violation of Eighth Amendment rights demonstrated by newly discovered evidence; and Claim VII — Violation (prospectively) of Eighth Amendment rights due to potential incompetence at the time of execution.

. The subclaims under Claim II for which the postconviction court denied relief were: E — Counsel failed to object to hearsay testimony about Mrs. Moody’s medical condition that allegedly made her more vulnerable; F— Counsel failed to re-raise the alleged spousal or marital communication privilege violation; G — Counsel failed to preserve for appellate review the trial court's excusing for cause two Spanish-speaking potential jurors. Woodel withdrew subclaim IID — Counsel failed to move to suppress Woodel’s statement to law enforcement officers, or to obtain an interrogation specialist.

. See supra note 2.

. See supra note 1.

. During the 1998 trial, Dr. Dee provided pertinent testimony regarding Woodel's practice of alcohol consumption:
Q. [Mr. Colon] Did you speak with the defendant to find out what time he began in his life to consume alcoholic beverages? A. Yes, to the best of my knowledge, and to his best estimate, it was sometime between 10 and 12 years of age.
Q. How did he characterize his usage from that point in time when he first started at age 10 or 12 until the time of this incident?
A. Well, according to his description, it was sporadic. But when he drank, he drank to intoxication. And you, know, from a mental health professional’s point of view, what he was describing was binge drinking, what I would characterize as an alcoholic, although he declined to characterize it that way.
Q. So the way he described it was when he told you he would drink, he'd simply drink until he—
A. Was out [i.e., unconscious] ...

. See generally Stephens v. State, 748 So.2d 1028, 1034 (Fla.1999) ("When sitting as the trier of fact, the trial judge has the ‘superior vantage point to see and hear the witnesses and judge their credibility.’ Appellate courts do not have this same opportunity. Despite this deference to a trial court’s findings of fact, the appellate .court’s obligation to independently review mixed questions of fact and law of constitutional magnitude is also an extremely important appellate principle.") (internal citations omitted).