# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D18-478

_____

JEFFREY TODD MORRIS,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

_____

On appeal from the Circuit Court for Escambia County.
Thomas V. Dannheisser, Judge.

June 28, 2019

PER CURIAM.

We review the trial court order denying Appellant's motion for post-conviction relief under Florida Rule of Criminal Procedure 3.850.

Appellant was charged by amended information with (Count 1) sexual battery while in a position of familial authority, for penetrating the vagina of the victim with his penis when the victim was between age fifteen and seventeen, (Count 2) sexual battery while in a position of familial authority, for penetrating the mouth of the victim with his penis when the victim was between age thirteen and seventeen, and (Count 3) lewd and lascivious molestation on a victim under twelve years old, for forcing or enticing the victim to touch him when she was between the ages of six and eleven.

1

The attachments to the order on Appellant's motion reflect the following facts. At trial, the victim testified that Appellant, her stepfather, made her touch his penis with her hands "two or three times a week," beginning when she was six or seven and continuing until she was eighteen. The victim testified that the abuse escalated: she stated she lost her virginity to Appellant when she was fifteen, and that if she was on her period she would perform oral sex. The victim testified that she eventually found out that she was pregnant and gave birth to a baby that she then put up for adoption. She identified Appellant as the person who impregnated her. DNA evidence presented at trial established by a 99.99 percent probability that Appellant was the biological father of the victim's child.

Video of an interview between Appellant and law enforcement was played at trial. During the interview, Appellant stated that, when the victim was eighteen, she got drunk on New Year's Eve and asked him to rub her vagina; Appellant stated that he pushed her away and told her to go to bed. At trial, however, Appellant admitted to having sexual intercourse with the victim, his stepdaughter, when she was eighteen, but never before.

Appellant's daughter, the victim's half-sister, who was fourteen at the time of trial, testified that she lived with her father, but "he didn't really pay attention to [her]," stating Appellant largely ignored her and her younger brother. Appellant's daughter testified that Appellant focused most of his attention on the victim, although she testified that she never saw anything that she thought was inappropriate. Appellant's daughter testified that Appellant would occasionally send her and her brother outside to play with the dog or clean the pool, but that the victim would not be sent outside with them. Appellant's daughter testified that she would sometimes try to go back inside to get water, but he door would be locked. Appellant's daughter testified that, when she and her brother would eventually be let back inside, she would see the victim "washing her hands and crying."

Appellant's twelve-year-old son also testified that when his mother was at work, and he and the victim were home with Appellant along with Appellant's daughter, Appellant would send his own children outside and that his son would find the door locked when he attempted to reenter.

2

The jury found Appellant guilty on all three counts, and the court sentenced him to concurrent thirty-year sentences for Counts 1 and 2, and to life in prison for Count 3.

Appellant filed an amended motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 raising seven grounds for relief. Pertinent here, Appellant claimed newly discovered evidence, and attached an affidavit from Appellant's daughter in which she swore that she now did not believe that Appellant had molested her sister. She stated that she felt she had been "coached or brain washed" to take her mother and sister's side over her father's, and that her mother "put a lot of things in [her] head." She stated that she had testified in court that her father didn't pay attention to her, and stated she now knows that his attention was focused on the victim "because they were in a relationship." Appellant's daughter stated that she felt she had been obligated to protect her mother and sister, and stated that "I think what my father did was very wrong, but in my heart I don't feel like he should be doing life for something he did not do something their [sic] is no proof of."

In his motion, Appellant also claimed that his trial counsel was ineffective for failing to call Appellant's parents and Ami Morris as witnesses at trial, failing to go over the victim's text messages with Appellant, and failing to introduce a letter Appellant wrote to his father in which he admitted having a sexual relationship with his eighteen-year-old stepdaughter. Appellant additionally raised two sentencing issues.

The postconviction court summarily denied the motion[*], finding that Appellant's daughter's recanted testimony would not probably produce an acquittal on retrial and that Appellant could not show prejudice on any of his ineffective assistance claims. This timely appeal followed.

*Analysis*

"The standard of review of a summary denial of a rule 3.850 motion is de novo." *McLin v. State,* 827 So. 2d 948, 954 (Fla. 2002). "To uphold the trial court's summary denial of claims raised in a

---

[*] The postconviction court granted relief on sentencing claims which are not at issue.

3.850 motion, the claims must be either facially invalid or conclusively refuted by the record." *Peede v. State*, 748 So. 2d 253, 257 (Fla. 1999).

Appellant first argues that the lower court erred in denying an evidentiary hearing regarding his claim of newly discovered evidence, in the form of Appellant's daughter's recantation of testimony regarding the victim. A defendant must meet two requirements to obtain a new trial based on newly discovered evidence: (1) "the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must also appear that neither the defendant nor defense counsel could have known of such evidence by the use of diligence"; (2) "the newly discovered evidence must be of a nature that it would probably produce an acquittal on retrial or yield a less severe sentence." *Davis v. State,* 26 So. 3d 519, 526 (Fla. 2009). "Specifically, recanted testimony that is alleged to constitute newly discovered evidence will mandate a new trial only if (1) the court is satisfied that the recantation is true, and (2) the recanted testimony would probably render a different outcome in the proceeding." *Id.* Recanted testimony would not have altered trial's outcome if it would not have eliminated other evidence at trial supporting the elements that the newly discovered evidence is offered to rebut. *Id.* at 529.

Here, even if the court accepted the recantation as true, such recantation could only potentially affect the daughter's testimony regarding what behavior she observed in the victim. The purported recantation would not eliminate or diminish in any way the testimony from the victim that Appellant continually sexually abused her beginning when she was six or seven until she was eighteen. At trial, Appellant's daughter, the victim's half-sister, did not testify that she saw Appellant sexually abuse her half-sister. In fact, this witness testified she saw nothing inappropriate occur with the victim and Appellant. And neither step-sibling testified that they observed Appellant abusing the victim.

Appellant's daughter testified that Appellant ignored her and her brother in favor of the victim and would send her and her brother outside, so he could be alone with the victim. The purported recantation stated that Appellant's daughter now understands that Appellant paid attention to her and her younger

4

brother "in a different way" than he did to the victim, because he and the victim "were in a relationship." Appellant's guilt was established by evidence completely separate from this testimony, and this recanted testimony would in no way render a different outcome in the trial, especially in light of the victim's detailed and devastating testimony and the Appellant's trial testimony that admitted he did have sexual intercourse with the victim, after Appellant firmly denied such occurred in a pretrial interview.

Although Appellant's trial admission claimed the intercourse occurred after the victim's eighteenth birthday, the admission was obviously harmful to Appellant's defense, because the inconsistency diminished his credibility. The jury knew Appellant denied that intercourse occurred but had to later explain the DNA evidence. Thus, the record conclusively refutes Appellant's claim on this ground; the asserted recantation could not have changed the outcome of the trial.

Appellant next argues his counsel was ineffective for failing to present Appellant's mother and father and another defense witness at trial, despite Appellant's request. Appellant states that these witnesses would have testified that they were around Appellant in the time period that the offenses allegedly occurred and never saw any improper behavior by Appellant towards the victim.

To prove ineffective assistance of counsel, the defendant must show (1) that counsel's performance was deficient, and (2) that the defendant was prejudiced by that deficient performance. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). To establish prejudice under *Strickland*, the defendant must demonstrate a reasonable probability that the result of the proceeding would have been different but for counsel's deficiency. *Hoskins v. State,* 75 So.3d 250, 254 (Fla. 2011). Appellant cannot show prejudice. Appellant claims that these uncalled witnesses would have testified that they never saw Appellant acting inappropriately toward the victim. But testimony at trial established that the abuse occurred when Appellant was left alone with the children, and the testimony of the uncalled witnesses could not diminish the credibility of the victim's testimony because it wouldn't rebut the testimony that abuse occurred when the witnesses weren't there. Appellant's ineffectiveness claim on this ground is therefore

5

meritless, and the postconviction court did not err in summarily denying Appellant's motion on this issue.

Appellant also argues that defense counsel should have more thoroughly investigated allegedly deleted texts between the Appellant and the victim, and the victim and her mother, but none of these texts, even if they exist, would have produced a different result. We need not decide if any of counsel's actions were deficient, if we determine that Appellant cannot show prejudice: "Because *Strickland* requires that a defendant establish both deficiency and prejudice, an appellate court evaluating a claim of ineffectiveness is not required to issue a specific ruling on one component of the test when it is evident that the other component is not satisfied." *Lebron v. State*, 135 So. 3d 1040, 1052 (Fla. 2014). To prevail on an ineffective assistance claim, "[t]he claimant must demonstrate a likelihood of a different result that is 'substantial, not just conceivable.'" *Carter v. State*, 225 So. 3d 881, 883 (1st DCA 2017) (quoting *Harrington v. Richter*, 562 U.S. 86, 112, 131 (2011)). "In order to sufficiently undermine the court's confidence in the outcome, a claimant 'must rely on more than mere speculation.'" *Id.* (quoting *Derrick v. State*, 983 So.2d 443, 462 (Fla. 2008)).

Appellant argues that if counsel had gone over the text messages with him, he would have been able to use those texts to challenge the credibility of the victim and of his wife. Appellant argues that deleted texts from the victim to Appellant after the victim had turned eighteen indicate that the victim wanted to have consensual sex with Appellant. But this evidence would not rebut the victim's testimony that she and Appellant had sexual intercourse before she turned eighteen.

Appellant argues that one omitted text message would have indicated that the victim gave differing explanations as to why she left her grandparents' house in Orlando. The victim testified that she left because Appellant would not let her mother leave her house, but Appellant claims a text shows that the victim told her aunt that she left early due to an argument with her grandmother. But the text message would have in no way refuted the victim's testimony regarding the extensive sexual abuse the victim suffered during the years in question.

6

Appellant argues that text messages indicate that he and the victim's mother went on two dates in June 2012, once to the movies and once to dinner, and Appellant could have used these text messages to challenge the mother's credibility. But there is not a reasonable probability that the outcome of the trial would have been different even if the text messages had completely destroyed the mother's credibility, which the texts would not have done, as Appellant's guilt was established by evidence entirely separate from the mother's testimony. Appellant cannot establish a reasonable probability that the outcome of the trial would have been different if he had been able to utilize the text messages at trial. The trial court properly denied relief on this claim.

Appellant next argues that trial counsel was deficient for failing to present at trial a letter that Appellant wrote to his father in which he admits to having a sexual relationship with his eighteen-year-old stepdaughter. Appellant argues that if counsel had presented this letter, the State would have been prevented from arguing that before trial, Appellant denied having a sexual relationship with his stepdaughter. However, as the postconviction court correctly noted, the video of Appellant's interview with law enforcement showed Appellant denied having any sexual relationship with his stepdaughter. Even if the letter had been presented at trial, the State still could have argued that Appellant lied to law enforcement about not having a sexual relationship with the victim. Appellant therefore cannot show a reasonable probability that the outcome of the trial would have been different if the letter had been presented. Appellant's ineffectiveness claim on this ground is therefore meritless, and the postconviction court did not err in denying Appellant's motion on this ground.

Appellant next argues cumulative error. The cumulative effect of numerous errors in counsel's performance may constitute prejudice, but only where "confidence in the outcome of [the defendant's] original trial has been undermined and that a reasonable probability exists of a different outcome." *State v. Gunsby,* 670 So. 2d 920, 924 (Fla. 1996). As stated above, even assuming that counsel was deficient, Appellant cannot show a reasonable probability that the outcome of the trial would have been different, in light of the victim's testimony, corroborating circumstantial evidence, and the evidence demonstrating

7

Appellant did engage in sexual intercourse with the victim, contracting his previous attempt to deny this fact. *State v. Woodel,* 145 So. 3d 782, 803 (Fla. 2014) ("Furthermore, because we do not find multiple errors in this case, there is no cumulative error effect that establishes prejudice").

AFFIRMED.

ROBERTS and OSTERHAUS, JJ., concur; B.L. THOMAS, C.J., concurs specially with opinion.

––––––––––––––––––––––

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

––––––––––––––––––––––

B.L. THOMAS, C.J., concurring specially.

I concur with the court's opinion and write to provide context to that opinion with additional facts from the record on Appellant's direct appeal filed with this court. It is well established that an appellate court may take judicial notice of its own files. *See Hillsborough Cty. Bd. of Cty. Com'rs v. Public Employees Relations Com'n*, 424 So. 2d 132, 133 (Fla. 1st DCA 1982) (holding courts may take judicial notice of their own records); *see also, e.g.*, *Loren v. State*, 601 So. 2d 271 (Fla. 1st DCA 1992) (stating that, in reviewing the summary denial of a postconviction motion, this court may take judicial notice of the direct appeal in its own records). I acknowledge the tension between this principle and the Florida Rules of Appellate Procedure, which define the record following summary denial of a rule 3.850 motion as "the motion, response, reply, order on the motion . . . and attachments to any of the foregoing" and state that an order summarily denying an appellant's motion shall be reversed unless this record "shows conclusively that the appellant is entitled to no relief." Fla. R. App. P. 9.141(2)(A), (D).

Facially sufficient claims of ineffective assistance of counsel require an allegation that the outcome of the movant's trial would have been different but for the claimed errors of counsel. In reviewing such a claim, a postconviction court must necessarily

consider the entire record of the proceeding to make a determination on ineffectiveness. Because these collateral actions assert that a claimed error affected an entire trial, in many cases such claims cannot truly be "conclusively refuted" without full consideration of that trial. But, of course, rule 3.850 cannot be construed to require attachment of the full trial transcript, see *Tillery v. State*, 639 So. 2d 76, 77 (Fla. 1st DCA 1994), and I do not suggest that postconviction courts should do so.

I do, however, think that where, as here, an appellate court has a transcript of the full trial proceeding in its records, it may take notice of these records in reviewing the lower court's ruling on the prejudice prong of an ineffective assistance claim. The supreme court has stated that, because ineffective assistance claims are mixed questions of law and fact that implicate a constitutional right, appellate courts have an obligation to "independently review" these claims. *Stephens v. State*, 748 So. 2d 1028, 1034 (Fla. 1999). The supreme court has further suggested that, because of this obligation, "an appellate court's review of a trial court's order denying an ineffective assistance claim requires consideration of the entire record that was before the trial court." *State v. Coney*, 845 So. 2d 120, 140 (Fla. 2003) (Pariente, J., concurring specially). *Stephens* and *Coney* did not involve review of a *summary* denial of an ineffectiveness claim, and Justice Pariente's call to review the entire record may be read to pertain only to a postconviction record following an evidentiary hearing. But because appellate courts are obligated to independently review mixed questions of constitutional magnitude, and because the prejudice determination necessarily requires a consideration of the entire proceeding by the postconviction court, it follows that a court reviewing that determination can and should review the entirety of that proceeding.

As such, I have taken notice of the record on Appellant's direct appeal and find the following facts useful in contextualizing Appellant's arguments and the portions of the trial transcript attached by the postconviction court.

The victim's mother testified that when she was married to Appellant he did not give the same attention to their children as he did to his step-daughter, the victim. The victim had no boyfriends and was only allowed one girlfriend. The mother

9

became concerned and suspicious about Appellant's relationship with the victim. The victim's mother began asking her daughter if Appellant had touched her inappropriately. The victim at first denied any inappropriate activity and would become "overly animated" and just say Appellant was "mean."

Appellant's ex-wife testified she confronted Appellant with her suspicions, but Appellant denied any inappropriate activity and told her she was an "idiot" and "he had every right to be close" to the victim. Appellant told the victim's mother that he was closer to the victim than their other children, because the victim was older and called him "daddy" when she was four.

The victim's mother testified that she and Appellant stopped having sexual relations before she discovered a text on Appellant's phone that had not been sent out. She testified that she came home that day and found the victim crying and saying she "hated" Appellant. There was chaos in the home with all the children in an uproar. The children had heard Appellant saying derogatory comments on the phone about their mother. The victim's half-brother testified that when Appellant finished that conversation, he gave an angry look at the victim and asked if she was mad "because they didn't hump today."

When she examined Appellant's phone, Appellant's ex-wife found the text which read "yeah, you didn't rub your butt against me last week." The victim's mother knew the text could not have been intended for her. She confronted her daughter about the text, who initially denied Appellant had been molesting her but then covered herself in a blanket and said "yes."

The mother, in an apparent state of shock and rage, testified the next thing she remembered was standing in the room where Appellant was sleeping and holding a gun in her hand. She didn't remember getting the gun but only holding the rifle to Appellant's head and screaming at him to wake up. The children, including the victim, defused the scene and prevented any violence, and the next thing the mother remembered was being outside and talking to police.

The victim's mother testified that she took all the children and left the home. She later learned the victim was pregnant, and Appellant was identified as the father. She also learned how long

the sexual activity between Appellant and the victim had continued.

The victim, who was nineteen at the time of trial, testified that she had known Appellant since she was four years old. He was a father figure to her; she called him "dad." The victim testified that Appellant began molesting her when she was six or seven years old and continued engaging in sexual activity with her until she was eighteen years old. When asked why she had not reported the sexual abuse earlier, she replied "I was scared."

The victim testified that the abuse escalated. Appellant began touching the victim and forcing her to put her mouth on his penis. He would ejaculate on a towel or his stomach.

The victim testified she lost her virginity to Appellant when she was fifteen. She told Appellant she did not want to have intercourse with him, but he said it would be "fine." Appellant had sexual intercourse with the victim "every Friday" or about two or three times a month.

The victim testified that Appellant was stricter with her than with his own children. He would not allow her to have any close friends, except one girlfriend. The victim testified that Appellant told her if he found out she had a boyfriend, he would also "put a bullet" in his head and "in her head too."

The deputy who first responded to the scene described the victim as crying hysterically and "very upset." The victim's mother was crying "but not hysterically" but as if "she was blown away" and "confused." A sheriff's investigator testified that he interviewed the victim in the emergency room that night. The victim "was crying, hiding her face behind her hands." This investigator also interviewed the Appellant.

The video of the interview between Appellant and the investigator was played at trial. During the interview Appellant waived his right to remain silent and right to counsel. The investigator informed Appellant that there were accusations that Appellant had engaged in sexual activity with the victim since she was six years old and that he had sexual intercourse with the victim "a week and a half ago." Appellant denied this. He also specifically denied he had sexual intercourse with the victim after

11

she turned eighteen years old. Appellant blamed the accusations on relationship problems with the victim's mother.

The foregoing facts further support the court's opinion that Appellant's daughter's recantation, the alleged failure to call Appellant's parents and Ami Morris as witnesses, and the alleged failure to use Appellant's letter to his father did not affect the outcome of the trial and thus did not prejudice Appellant.

Appellant also claimed counsel was ineffective for failing to properly use certain text messages to impeach State witnesses. Appellant argues that one omitted text message would have showed that the victim gave conflicting explanations as to why she left her grandparents' house. The victim testified that she left because Appellant would not let her mother leave her house, but Appellant claims a text shows that the victim told her aunt that she left early due to an argument with her grandmother. In the text in question, the victim told her aunt "Yeah mom was really depressed and I missed her a lot and me and mammawl kind of got in an argument but we're fine now." This text message is not inconsistent with the victim's testimony, as both indicate she left her grandparents' house because her mother was having problems. This text message would not have refuted the victim's testimony that Appellant repeatedly sexually abused her throughout much of her childhood.

At trial the victim's mother testified that she and Appellant had not had sexual relations in over a year before she was made aware of the sexual abuse and testified that she and Appellant did not ever go out on dates. Appellant argues that text messages indicate that, contrary to her testimony, he and the victim's mother went on two dates in June 2012, once to the movies and once to dinner, and Appellant could have used this inconsistency to challenge the mother's credibility. However, the context of the relevant testimony indicates that she meant she and Appellant had not gone out recently, not that they had never gone on a date. As stated above, Appellant cannot establish a reasonable probability that the outcome of the trial would have been different if he had been able to utilize the text messages at trial. The victim's mother's testimony was relatively brief, and the matters involved in the text were essentially collateral the mother's testimony.

12

Based on the foregoing, I concur with the court's opinion to affirm the postconviction court's summary denial of Appellant's motion alleging ineffective assistance of counsel.

_____

Michael Ufferman, Tallahassee, for Appellant.

Ashley Moody, Attorney General, Jennifer J. Moore, Assistant Attorney General, Tallahassee, for Appellee.